**Stephen N. ROTH, M.D.,**
**Plaintiff–Appellant,**

v.

**LUTHERAN GENERAL HOSPITAL, Jerome Kraut, M.D., Seymour Metrick, M.D., et al., Defendants–Appellees.**

No. 94–2382.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 10, 1995.

Decided June 27, 1995.

Darlene A. Vorachek, Vicki Lafer Abrahamson (argued), Janice M. Rauen, Abrahamson & Associates, Chicago, IL, for plaintiff-appellant.

Harold E. McKee, III, Douglass G. Hewitt (argued), Scott O. Reed, John P. Sexton, Sedgwick, Detert, Moran & Arnold, Chicago, IL, for defendants-appellees.

Before ESCHBACH, COFFEY, and RIPPLE, Circuit Judges.

COFFEY, Circuit Judge.

Dr. Stephen N. Roth appeals from the district court's denial of his motion for a preliminary injunction seeking admission to Lutheran General Hospital's pediatric residency program. Dr. Roth, who has strabismus,[1] had filed a lawsuit under the Rehabilitation Act of 1973, 29 U.S.C. § 794, *et seq.* and the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, *et seq.*, alleging, among other things, that the hospital and various members of the resident selection committee discriminated against him in their selection process because of his eye disability, and also retaliated against him for exercising his rights to obtain legal redress under the Acts. We affirm.

## I. Background

Dr. Roth has had a history of medical problems relating to his eyes. According to Roth, he was diagnosed as legally blind in his right eye when he was 12 years of age. Despite his visual condition, Dr. Roth earned a degree in pharmacy in 1979 from the University of Illinois, and became a registered pharmacist. That same year, he entered DePaul Law School as a full-time student, spending approximately 25 hours per week studying and attending classes, and during this same period working 15 to 35 hours per week as a pharmacist. While in law school, Dr. Roth experienced eye strain and was fitted with a contact lens that improved the visual acuity in his right eye. According to Roth, during the years following the adjustment, he "perceived no problems with his vision and functioned very well both as a registered pharmacist and an attorney."

Between 1982 and 1987, Dr. Roth worked as an attorney/consultant and as a pharmacist. From 1987 to 1989, he was employed as a "prosecutor/medical attorney" for the Illinois Department of Professional Regulation. In 1988 Dr. Roth also applied and obtained a position as a faculty lecturer at the University of Illinois. Although the application asked the applicant to specify whether he had a handicap, Dr. Roth failed to list his visual condition, much less characterizing it as a handicap, on his application and described his health as "good." The record reflects that Dr. Roth did not receive any accommodation with regard to his visual condition while pursuing either his pharmacy or law degree, or while employed in any of the positions he held before 1989. In 1989 Dr. Roth applied and was admitted to the University of Illinois at Chicago Medical School (UIC). In his medical school application, Roth referred to his visual condition as a "former" problem, stating that the condition "no longer confronts [him]" and "ha[s] been cured." Specifically, he stated that vision in his right eye was restored in 1981.

In the first quarter of his medical school career, Dr. Roth allegedly experienced eye strain and had some difficulty while using a

---

1. Strabismus is a condition in which the eyes are not correctly aligned. For example, one eye may be looking straight ahead while the other eye is not looking in the same direction.

binocular microscope. He was examined by Dr. Paul Parmet, an ophthalmologist, who diagnosed that Roth suffered from strabismus, minor anisometropia,[2] and mild amblyopia.[3] Dr. Parmet's findings were confirmed by examinations performed at the University of Illinois as well as the University of Chicago eye clinics. Dr. Parmet opined that Roth's visual condition was congenital, and that his ability to fuse images and achieve stereopsis[4] is poor. Thus, according to Dr. Parmet, any laboratory tasks requiring fine perception of depth, such as viewing through a binocular microscope, would be difficult for Roth. Dr. Parmet stated, however, that while Roth's condition is not completely correctable by glasses or other means, Roth has "adapted well to daily activities and he should have the visual capacity to function well in most medical specialties." Additionally, Dr. Parmet opined that Roth is subject to eye strain and eye fatigue faster than a person with normal (nonstrabismic) eyesight, and the possible manifestations include sleepiness, double vision, headaches and diminished visual acuity. Dr. Parmet further noted that when Roth's eyes are not strained, his visual acuity is good.

Apparently based upon Dr. Parmet's recommendation that "flexibility in [Roth's] educational requirements, specifically his laboratory requirements, is called for," and at Dr. Roth's own requests, UIC made several accommodations for him. They include modifying Roth's laboratory examinations, relieving him from "night call" and surgical-type procedures which required him to look downward for prolonged periods of time, and allowing him to select hospital clerkship sites that had lighter duty schedules. In spite of his eye problem and the accommodations made for his condition, Dr. Roth continued to serve as a faculty lecturer at the University of Illinois, College of Public Health and a defense attorney/consultant during medical school. According to Roth's resume (which was submitted as part of Roth's application

to various residency programs), Roth also continued to be gainfully employed as a pharmacist and published several law related articles during medical school. However, at the preliminary injunction hearing, Roth testified under oath that the representation that he worked as a pharmacist during medical school was incorrect. He also testified that he was not directly responsible for one of the articles listed on his resume but was merely a participant in a roundtable discussion, which was taped and published.

In 1992 Dr. Roth filed a complaint with the U.S. Department of Education (DOE), the City of Chicago, and the State of Illinois, alleging that he received a below average grade in an obstetrics/gynecology clerkship program at the Illinois Masonic Hospital as a result of discrimination. On March 9, 1994, the DOE found that Roth is an individual with disabilities under the Rehabilitation Act and the ADA, and that Roth's grade and ratings in the clerkship were likely to have been tainted by bias. It concluded that UIC had violated the Acts, and that but for the discrimination, Roth would not have received a below average evaluation in the clerkship. In response to the DOE's finding, UIC re-evaluated Roth's grade and ultimately gave Roth a passing grade.

Dr. Roth also filed other discrimination complaints against UIC relating to his failure to gain admission to an honor society, denial of his application for an independent study program, a negative evaluation in a surgery clerkship, and other alleged discriminatory conduct. None of those claims resulted in a finding of discrimination. With respect to his claim that the honor society violated its policies in denying him admission because of discrimination, Dr. Roth stated in the sworn complaint that his academic performance exceeded the objective criterion for admission (which requires an applicant to be in the top ten percent of the class). At the evidentiary

---

**2.** Anisometropia is a difference in the refractive power of the two eyes. *See Dorland's Illustrated Medical Dictionary,* p. 90 (W.B. Saunders Co., 27th ed. 1988).

**3.** Amblyopia is an impairment of vision without detectable organic lesion of the eye. *See Dor-*

*land's Illustrated Medical Dictionary* at p. 56. The condition causes diminished visual acuity.

**4.** Stereopsis is vision of objects appearing in three dimensions. *See Dorland's Illustrated Medical Dictionary* at 1581.

hearing before the district court, Dr. Roth testified that he did not know whether he was in the top ten percent of the class. UIC's associate dean contradicted Dr. Roth's testimony, stating that Roth was not in the top ten percent of the class and that his objective academic performance did not exceed that of those students admitted to the honor society.

While in medical school, Dr. Roth participated in three clerkships at the Lutheran General Hospital (LGH), and did not request any accommodations for those clerkships. In one of the clerkships, Dr. Roth was under the supervision of defendant Dr. Jerome Kraut, who felt that Dr. Roth did a good job and would be a good candidate for the pediatric residency program. Dr. Kraut, the director of the pediatric residency program, encouraged Roth and a number of other students participating in LGH's pediatric clerkship to apply to LGH's pediatric residency program. He had no knowledge of Dr. Roth's visual condition at the time.

In December 1992, Dr. Roth applied to five pediatric residency programs, including LGH, and two psychiatry residency programs, all located in Chicago.[5] In his 1992 application to LGH, Roth stated that although he was born with strabismus, he "no longer considered this an obstacle to his medical education" because he had been fitted with a contact lens which "corrected his visual acuity." Roth neither requested nor indicated that he would need a part-time schedule or any other type of accommodation.

LGH invited Dr. Roth in for an interview. Roth was initially interviewed by Dr. Kraut. In the beginning of the interview, Dr. Kraut told Roth that "things looked very positive." Roth then informed Dr. Kraut during that same interview that he had strabismus which would cause him to develop a headache, blurred vision or to be dysfunctional if he were to work more than an eight to ten hour shift. Roth stated that he would require accommodation from LGH's alleged requirement that a resident be on call for 36 hours at a time "three times a week." [6] Specifically, Roth suggested that he could not take "night call." Dr. Kraut asked whether Roth had discussed his disability with other directors of pediatric residency programs at other hospitals. Roth responded that he did, and without specifying which program, Roth stated that one program director had suggested adding an extra position to accommodate him. According to Roth's own testimony, Dr. Kraut then stated that "it sounded like a good idea." During the course of conversation, Roth referred to the various disability laws. In response, Dr. Kraut asked Roth to explain these disability laws. Roth stated, however, that he could not give legal advice but would send Kraut a list of the laws. Dr. Kraut then asked Roth what he would do if he did not secure a residency position. Roth responded that he would have no alternative but to pursue legal action.

At the conclusion of the interview, Dr. Kraut advised Roth not to discuss his visual impairment or need for accommodation with any of the other interviewers. He stated that he would check with the administration concerning accommodating Roth, such as adding an extra residency position or half a position in an attempt to accommodate Roth's alleged inability to take night calls. Dr. Kraut did not give Roth a numerical rating, but noted on the interview evaluation sheet that Roth was "well-known to [LGH]— BUT strabismus." Dr. Kraut also noted,

---

5. Applicants seeking positions in graduate medical residency programs usually make an initial application to the individual programs at various hospitals. The individual residency programs then invite selected applicants in for an interview. After the interviewing process is completed, the applicants submit their list of preferences to the National Residency Matching Program (NRMP). The NRMP then match the applicants' ranking lists with those of the programs. Hospitals with residency programs are required to accept the applicants with whom they match.

6. Although Dr. Roth's brief states, and the defendants do not dispute, that LGH's pediatric residency program requires a resident to "remain[] functional" for 36 hours at a time three times a week," *see* Plaintiff's Brief at 16, the Accreditation Council for Graduate Medical Education (ACGME) requires pediatric residents to be on call for only an average frequency of every third or fourth night in any year of the residency program. *See Essentials and Information Items 1993–1994, ACGME,* "Special Requirements for Residency Training in Pediatrics" at 95.

"add a special slot," apparently as a reminder to pursue the possibility of adding another pediatric residency slot to accommodate Roth. Dr. Kraut did not submit his evaluation sheet or reveal Roth's alleged disability to the other selection committee members until they had decided not to rank Roth in the committee meeting on February 8, 1993.

Dr. Roth was next interviewed by Dr. Seymour Metrick, who gave Roth superior ratings in the categories of attitude, communication skills, and "education, experience, extracurricular activities, research and publications," but noted that he was concerned "as to how interested [Roth] would be in functioning as a resident." He gave Roth a 3 [average] on a scale of one to five in "overall impression." Dr. Roth's third interviewer was Dr. Monte Hetland, who also gave Roth a superior rating in the education category. However, Dr. Hetland gave Roth a zero in "attitude," and a one in "communication skills" and "overall impression." Dr. Hetland wrote, "[Roth] comes across as the most insolent and arrogant resident applicant that I have ever interviewed.... I cannot imagine working with Mr. Roth in a supervisorial role, and I would not rank him at all." [7] Dr. Hetland further noted that Roth did not ask any questions regarding the program but merely stated that "I pretty much know it all." When asked why he considered himself to be a good prospective resident, Roth responded that "you'll have to ask the faculty ... with whom I've done rotations." According to Dr. Hetland, he spoke with Dr. Kraut about his negative evaluation of Roth after the interview, and reiterated his recommendation not to rank Roth.

Sometime after Dr. Roth's interview, Dr. Kraut spoke with Dr. Elizabeth Gordon, the administrator responsible for supervising LGH residency programs, concerning the possibility of accommodating Dr. Roth. According to Dr. Gordon she told Dr. Kraut that LGH would accommodate Roth if he became a resident at LGH. Dr. Kraut testified that he was also informed by Dr. Gordon that LGH had accommodated disabled residents in the past, including providing a full-time interpreter for a deaf resident in the family practice department.

Thereafter, Dr. Kraut, as the new program director, prepared a preliminary ranking list and ranked Dr. Roth number 49th out of the 60 applicants on the list. On February 8, 1993, the selection committee met to review the applicants and formulate the final ranking list. Among the approximately ten committee members in attendance, Roth's interviewers, Dr. Hetland, Dr. Metrick, and Dr. Kraut, were present. Other members included Dr. Sigmund, Dr. Kreiger, Dr. Chez, Dr. Schnitzler, and two hospital administrators, Mr. Murow and Ms. Oseland. Dr. Hetland testified that he reiterated what he had written on Roth's evaluation form to the committee and recommended that the committee not rank Roth. According to Dr. Hetland and another committee member Dr. Kreiger, Dr. Metrick also told the committee that he was not impressed by Dr. Roth and was unsure about Roth's interest in the program. Dr. Metrick, however, could not recall who was present at the meeting or any specific discussion concerning Dr. Roth during this meeting, although he did recall having a conversation with Dr. Hetland in which Hetland was "very adamant" against Roth joining the program. The committee decided not to rank Roth at all. Up until this point, the subject of Dr. Roth's alleged disability was not discussed, and no member of the resident selection committee (other than Dr. Kraut) was aware of Roth's condition. Dr. Kraut testified that during the committee meeting, he did not reveal Roth's alleged disability until after the committee had made its decision not to rank Roth. According to Dr. Kraut, he also did not make any mention of Roth's statement about pursuing legal action against LGH (if he did not match with a residency program) until the decision not to rank Roth had been made. In spite of being informed by Dr. Kraut that Roth might pursue legal action against LGH, the committee remained firm in its decision not to rank Roth. Thus, at the conclusion of this first

---

**7.** In accordance with the NRMP rules, a residency program must accept any applicant listed on its ranking list.

committee meeting; Dr. Roth was not included in LGH's pediatric residency ranking list.

Dr. Kraut later informed Dr. Gordon of the committee's decision not to rank Dr. Roth, and expressed his concerns about Roth's not being ranked based solely on his performance in a single interview, and the possibility that Roth might pursue legal action. Dr. Gordon suggested that the selection committee could be reconvened to reconsider Dr. Roth's application. Dr. Gordon testified that she also informed Dr. Kraut that if Roth was ranked, he probably would match with LGH in light of LGH's prior history of being unable to fill its quota of pediatric residents through the matching system. In fact, in the previous year, LGH had filled only three out of the nine available positions through the matching system. On February 16, 1993, a second selection committee, consisting of five members including Dr. Hetland, Dr. Kreiger, and Dr. Kraut, met to reevaluate Dr. Roth's application. The committee ultimately ranked Dr. Roth number 42 on LGH's list which was at the bottom of the graduates of the U.S. medical schools who applied to LGH.[8]

Approximately one month before the deadline for submission of his ranking list, Dr. Roth informed the NRMP of his alleged disability and requested that the deadline be extended or he would suffer severe harm. Roth advised the NRMP that failure to accommodate him would violate disability laws. One week before the deadline, Dr. Roth again wrote to the NRMP and requested the right to reach an agreement with a residency program before the Match, even though the NRMP rules generally prohibit this kind of agreement before the matching process is completed. The NRMP responded that it could not delay the deadline for Roth, but would permit Roth to withdraw from the Match to arrange a residency position. Roth elected to remain with the Match, and listed two pediatric residency programs in the Chicago metropolitan area, LGH and Christ Hospital, on his preference list.[9]

Dr. Roth did not match with LGH, missing it by two positions.[10] He did not attempt to obtain any of the 260 pediatric residency positions (including four positions in Chicago) still available after the Match. Although Roth stated in his affidavit that "he was the only graduate in [his] class not to have been matched," thirteen of his classmates actually did not match with a residency program. All of them contacted the residency programs still available after the Match, and obtained a position at other hospitals by the following day. Thereafter, Dr. Roth commenced discrimination actions against both of the pediatric residency programs he had ranked, including LGH. He also sought a preliminary injunction seeking his immediate admission to LGH's pediatric residency program pending outcome of the litigation.

Dr. Roth graduated in the top quarter of his medical school class, and received accommodations [11] during the National Board of Medical Examiners examinations. In November 1993, Dr. Roth requested an application from LGH. Dr. Kraut responded that "[i]n review of the litigation which you have filed ... and the accusation you have made in connection with the lawsuit, we must respectfully decline your request." Thereafter, Dr. Roth amended his claims against the defendants to include a retaliation claim.

Dr. Roth participated in the 1994 Match, ranking only one program in addition to the

---

8. According to Dr. Kraut, in listing its preferences for the residency applicants who apply to LGH, LGH generally tends to rank graduates of U.S. medical schools higher than graduates of foreign medical schools.

9. That is, Dr. Roth limited his chances of obtaining a pediatric residency program through the NRMP to two.

10. Of LGH's six available positions, the last three were filled by applicants ranked numbers 38, 39, and 40.

11. Although it is unclear exactly what accommodation Roth received during the National Board examinations, the "Agreement for Testing Disabled Individuals" entered into by the National Board of Medical Examiners and Roth stated that Roth would receive one or more of the following arrangements: 1) taking the examination in a room separate from examinees testing under standardized conditions; 2) given extended time limits for the examination; 3) given assistance in reading the test material and/or recording his answers.

two that he had already sued and listing LGH as his first choice. After he again failed to obtain a residency program through the Match, Dr. Roth did not attempt to seek any of the 160 pediatric residency positions that were available after the Match.

In denying the motion for a preliminary injunction, the district court found that Dr. Roth failed to establish that he was an individual with a disability within the meaning of the statutes. Finding that Roth's impairment did not rise to the level of substantially limiting one or more of the major life activities, the district court also noted that Dr. Roth was less than credible with regard to his physical limitations as well as his testimony in general:

> Based upon the substantial impeachment of the plaintiff, it appears to me that Dr. Roth has attempted through the past decade or so, since he learned of this impairment, or what he claims to be an impairment, he has attempted to utilize that impairment to his benefit, and when it doesn't benefit him, he doesn't tell people about it.

The district court also found that even if Roth could demonstrate that he was in fact disabled, the defendants' ranking decision was based on a legitimate concern about Dr. Roth's arrogance, or at the very least, lack of respect for Dr. Hetland. The district court stated specifically,

> "I viewed the witnesses on the witness stand ... I viewed Dr. Kraut, I viewed Dr. Hetland, I've listened to the testimony of the other doctors, viewed their demeanor, evaluated their credibility, and find that there was no discriminatory intent on the part of the Lutheran General Hospital at all."

Finally, the district court rejected Dr. Roth's claim that the defendants' refusal to provide him with an application was based on a retaliatory motive.

## II. Analysis

■ " 'The purpose of a preliminary injunction is to minimize the hardship to the parties pending the ultimate resolution of the lawsuit.' " *Kellas v. Lane*, 923 F.2d 492, 493 (7th Cir.1990) (quoting *Faheem-El v. Klin-*

*car*, 841 F.2d 712, 716 (7th Cir.1988) (en banc)). To prevail on a motion for preliminary injunction, the moving party must meet the threshold burden of establishing (1) some likelihood of prevailing on the merits; and (2) that in the absence of the injunction, he will suffer irreparable harm, for which there is no adequate remedy at law. *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931, 95 S.Ct. 2561, 2567–68, 45 L.Ed.2d 648 (1975); *Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1067 (7th Cir.1994); *Abbott Lab. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir.1992); *Kellas*, 923 F.2d at 493. Only when the moving party clears both of these prerequisites should a district court engage in a "sliding scale" analysis by balancing the harms to the parties and the public interest. *Storck U.S.A., L.P. v. Farley Candy Co.*, 14 F.3d 311, 314 (7th Cir.1994); *Erickson*, 13 F.3d at 1067; *Abbott Lab.*, 971 F.2d at 11–12; *Faheem-El v. Klincar*, 841 F.2d 712, 716 (7th Cir.1988) (en banc). In assessing and weighing the competing considerations, "the district court has to arrive at a decision based on a subjective evaluation of the import of the various factors and a personal intuitive sense about the nature of the case." *Faheem-El*, 841 F.2d at 716 (quoting *Lawson Products, Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1436 (7th Cir.1986)); *see also Abbott Lab.*, 971 F.2d at 12 (characterizing district court's preliminary injunction analysis as "subjective and intuitive"); *Roland v. Air Line Employees Association Int'l*, 753 F.2d 1385, 1392 (7th Cir.1985). Thus, this court gives substantial deference to a district court's decision to grant or deny a preliminary injunction, and will reverse only if the district court has abused its discretion. *Zorzi v. County of Putnam*, 30 F.3d 885, 895 (7th Cir.1994); *Abbott Lab.*, 971 F.2d at 13. Moreover, we can affirm the district court's decision on any ground. *See Ping v. National Education Ass'n*, 870 F.2d 1369, 1371 (7th Cir.1989).

### A. Likelihood of Success

#### 1. Dr. Roth's Discrimination Claim

■ We are of the opinion that the district court did not abuse its discretion in finding that Dr. Roth has failed to establish some likelihood of success on the merits. To suc-

ceed on his claims under the Rehabilitation Act and the ADA, Roth must meet the threshold burden of establishing that he is "disabled" within the meaning of the statutes. *Hamm v. Runyon,* 51 F.3d 721, 724 (7th Cir.1995); *Jasany v. United States Postal Service,* 755 F.2d 1244, 1248 (6th Cir.1985). As the district court properly observed, the inquiry is an individualized one, and must be determined on a case-by-case basis. *Byrne v. Board of Education,* 979 F.2d 560, 564 (7th Cir.1992); *Forrisi v. Bowen,* 794 F.2d 931, 933 (4th Cir.1986).

An individual is "disabled" if he has (1) a physical or mental impairment which substantially limits one or more of the major life activities; (2) a record of such an impairment; or (3) if he is regarded as having such an impairment. 29 U.S.C. § 706(8)(B); 29 C.F.R. § 1613.702(a); 42 U.S.C. § 12102(2); 29 C.F.R. § 1630.2(g); *Hamm,* 51 F.3d at 724. "Major life activities" are defined as "functions, such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. §§ 1613.702(c), 1630.2(i); *Hamm,* 51 F.3d at 724. The determination of whether a condition constitutes an impairment, or the extent to which the impairment limits the individual's major life activities must be made without regard to the availability of mitigating measures such as medicines, or assistive or prosthetic devices. *See* 29 C.F.R. pt. 1630 App. § 1630.2(h), (j). However, the mere use of a mitigating measure does not automatically prove the presence of a disability; some individuals may use medication, prosthetic devices, or auxiliary aids to alleviate impairments that are not substantially limiting. *See EEOC Compliance Manual* § 902.5 (March 1995). Moreover, not every impairment that affected an individual's major life activities is a substan-

tially limiting impairment.[12] *Hamm,* 51 F.3d at 726 ("Many impairments do not impact an individual's life to the degree that they constitute disabling impairments.") (quoting 29 C.F.R. § 1630.2(j)(1)(ii)). The key is the extent to which the impairment restricts a major life activity; the impairment must be a significant one. *Forrisi,* 794 F.2d at 934; *EEOC Compliance Manual* § 902.4.

While Dr. Roth's impairment may have affected his major life activities, he has failed to establish that the impairment rises to the level of a disability. The gist of Dr. Roth's allegations are as follows: he is prevented from pursuing his chosen profession as a medical specialty doctor because in order for him to be certified as a specialist in a particular field of medicine, he must successfully complete a post-graduate residency program. He further alleges that because all residency programs require long shifts (such as the 36 hour calls at LGH) and his visual condition prevents him from working for more than eight to ten hours straight, he is substantially limited in performing the major life activities of seeing and learning. As an initial matter, it is not established in this record that each and every pediatric residency program requires 36 hour calls or long shifts. Indeed, the entities responsible for regulating pediatric residency programs, the Accreditation Council for Graduate Medical Education and the American Board of Pediatrics, do not prohibit part-time residency programs, nor do they require "a stipulated number of daily or weekly hours," so long as the part-time resident receives a total of 33 months of training with graduated responsibility. Drawing an analogy to employment cases where the inability to perform either a particular job for a particular employer or a narrow range of jobs is held not to be a disability,[13] we cannot say that an inability to

---

12. The term "substantially limits" means that the individual is either unable to perform, or significantly restricted as to the condition, manner or duration under which the individual can perform, a major life activity as compared to an average person in the general population. *See* 29 C.F.R. § 1630.2(j)(1)(ii).

13. *See Byrne,* 979 F.2d at 564; *see also Bolton v. Scrivner Inc.,* 36 F.3d 939, 942 (10th Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 1104, 130

L.Ed.2d 1071 (1995); *Gupton v. Commonwealth of Virginia,* 14 F.3d 203, 205 n. 3 (4th Cir.), *cert. denied,* — U.S. —, 115 S.Ct. 59, 130 L.Ed.2d 17 (1994); *Cook v. Rhode Island, Dep't of Mental Health, Retardation, & Hosps.,* 10 F.3d 17, 26 (1st Cir.1993); *Chandler v. City of Dallas,* 2 F.3d 1385, 1392–93 (5th Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 1386, 128 L.Ed.2d 61 (1994); *Maulding v. Sullivan,* 961 F.2d 694, 698 (8th Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 1255, 122 L.Ed.2d 653 (1993); *Daley v. Koch,*

fulfill long shifts or 36 hour call duties (as may be the requirement at LGH) necessarily proves that Dr. Roth is disabled within the meaning of the Acts. *Cf. Byrne,* 979 F.2d at 564 (stating that the definition of "major life activity" cannot be interpreted to mean "working at the specific job of one's choice.").

More importantly, no objective medical findings directly support Dr. Roth's assertion that he is so significantly restricted by his visual impairment such that he is incapable of performing night calls. Roth's treating physician, Dr. Parmet, did determine that Dr. Roth's ability to do laboratory work may be limited because of Roth's lack of stereopsis, or limited ability to see objects in three dimensions. Dr. Parmet, however, stated that the condition will not affect Dr. Roth adversely in the practice of medicine if he can avoid tasks such as the use of a binocular microscope requiring the fine perception of depth and other procedures that require good stereopsis. Dr. Parmet further noted that while Roth's condition is not completely correctable through the use of glasses or other means, Roth has "adapted well to daily activities and he should have the visual capacity to function well in most medical specialties." As to Dr. Roth's visual endurance, Dr. Parmet testified at the hearing that Roth had complained of occasional double vision, eye strain, fatigue, difficulty focusing and headaches, all of which symptoms are consistent with Roth's visual condition. Dr. Parmet stated, however, that Roth's condition, which was congenital, has remained stable at least in the five years he had consulted with him professionally.[14] Although Dr. Parmet opined that Dr. Roth becomes visually fatigued faster than an individual not suffering

from strabismus, Parmet testified that it is not possible to objectively measure the extent of a patient's eye fatigue, or to quantify the rate at which one develops eye strain. Thus, Dr. Parmet stated that he was not in a position to determine whether or not Dr. Roth was physically able to perform satisfactorily a 36 hour shift while suffering from strabismus. As to whether Roth could function successfully in any residency program without accommodation, Dr. Parmet testified that he would not be able to render an opinion without relying primarily on Dr. Roth's own statements as to what he can or cannot do and what his limitations are. The question, then, becomes one of Dr. Roth's credibility.

The district court could determine that Dr. Roth was not credible (with regard to his alleged inability to work for more than eight to ten hours a day) based on Roth's past work and professional history.[15] Dr. Roth was able to successfully complete both his pharmacy and law degrees without any accommodation. Although it may be true, as Dr. Roth argues, that medical study is more demanding than law school or pharmacy school, his schedule appears to have been quite vigorous while attending law school. He attended law school full-time while also being employed as a pharmacist on weekends and evenings for approximately 15 to 35 hours a week. Additionally, while he was employed as a "prosecutor/medical attorney" for the Illinois Department of Professional Regulation, Dr. Roth was also a faculty lecturer at UIC. In spite of his eye problems, he continued to serve as a faculty lecturer and defense attorney/consultant while he at-

892 F.2d 212, 215 (2d Cir.1989); *Jasany v. United States Postal Service,* 755 F.2d 1244, 1250 (6th Cir.1985).

**14.** This finding is echoed by Dr. Timothy McMahon of the UIC Eye Center who opined in 1990 that Roth's "mild amblyopia, strabismus, and anisometropia appears to be reasonably stable."

**15.** The district judge made comments in his oral order from the bench which suggest that Dr. Roth's visual endurance problem could be "correct(ed)" or overcome by sufficient effort. From our review of the record we have been unable to find any support for such a finding. For instance, the judge also stated that "if [Roth] were

to try to increase endurance, he would be able to do so," and that "unless it is something that causes a substantial limitation on one's major life activity, you cope with it, you overcome it, and you rise above it." These comments on the part of the court can at best be classified as somewhat unusual. However, since the district judge's conclusions as to Dr. Roth's present abilities as opposed to his abilities to correct any condition of eye fatigue from which he may suffer were consistent with the objective medical evidence and supported by objective evidence in the record, these passing statements, although ill-advised, do not affect our decision.

tended medical school. In addition, his resume indicated that he was responsible for eight publications between 1989 and 1991.

The district court's determination that Dr. Roth was not a credible witness and was substantially impeached during the hearing is well-supported in this record. Roth claimed in an affidavit submitted to the district court that he was the only graduate in his class not to have been matched with a residency program, when in truth and in fact thirteen of his classmates also failed to match. Similarly, Dr. Roth stated in the affidavit that he was required to apply through the NRMP in order to obtain a residency position, when in fact, upon his request for accommodation, NRMP allowed him to reach an agreement with a residency program outside of the Match. Additionally, Roth's resume submitted as part of his application to LGH and other residency programs indicated that he had worked as a pharmacist and published various articles while in medical school. However, upon cross-examination at the preliminary injunction hearing, Roth stated that his representation that he had worked as a pharmacist during medical school was untrue. He also testified that he did not author one of the articles listed under the "health professional publications" section of his resume but was merely a participant in a roundtable discussion, which was taped. Although Roth alleged in one of his prior state discrimination complaints against his medical school that he was not admitted to an honor society despite meeting the objective criteria for admission (such as being in the top ten percent of the class), he admitted at the preliminary injunction hearing before the district court that he did not know whether his sworn statement of meeting the objective criteria for admission was true. In fact, Roth's sworn statement was false; an associate dean of Roth's medical school testified that Roth was not in the top ten percent of his class and that his objective academic performance did not exceed that of those students admitted to the honor society.

■ Significantly, Dr. Roth repeatedly represented in his medical school and residency program applications that his visual condition was a "former" problem which had been "corrected" and "no longer confront[ed]" him.[16] Yet, as the district court found, when it was beneficial and opportune to disclose his alleged disability, Roth would do so and advise that the failure to accommodate him would violate the disability laws. For instance, Dr. Roth waited until less than one month before the ranking list was due to inform the NRMP of his alleged disability and demand an extension and the right to reach an agreement with a residency program prior to the Match. He reminded the NRMP that the failure to accommodate him would not conform with the disability laws and would cause him "irreparable damage." Similarly, although his application to LGH affirmatively represented that his visual condition no longer confronted him, he informed Dr. Kraut at the interview that he would not be able to work for more than eight to ten hours. In referring to the disability laws during the interview, Roth also suggested to Dr. Kraut that if he did not match with a residency program he would pursue legal action. Thus, in light of Dr. Roth's past history and the substantial impeachment of Roth, the district court could very easily conclude that Roth's testimony as to what he can or cannot do lacks credence.

Dr. Roth also argues that he is "disabled" because he has had a record of, or was regarded as having, a visual impairment. To combat the effects of erroneous but nevertheless prevalent perceptions about the handicapped, Congress broadly defined the term "disability" to preclude discrimination against " '[a] person who has a record of, or is regarded as having, an impairment [but

---

16. We recognize that relief under the Rehabilitation Act and the ADA is not conditioned upon an applicant's giving precise notice of the disability. *See, e.g., Blackwell v. U.S. Dept. of Treasury,* 830 F.2d 1183 (D.C.Cir.1987) (J. Ginsburg). Indeed, such a requirement would be in tension with the regulatory admonition against asking a prospective employee whether he or she is handicapped. *See* 29 C.F.R. § 1613.706(a). However, when making a credibility determination, there is a difference between not disclosing a disability and affirmatively characterizing an alleged disability as a past problem overcome but later claiming protection under the Acts based on that disability.

who] may at present have no actual incapacity at all.'" *School Board of Nassau County v. Arline,* 480 U.S. 273, 279, 107 S.Ct. 1123, 1126, 94 L.Ed.2d 307 (1987) (quoting *Southeastern Community College v. Davis,* 442 U.S. 397, 405–06 n. 6, 99 S.Ct. 2361, 2366–67, 60 L.Ed.2d 980 (1979)). However, the record of impairment must still contain a history of, or a misclassification as having, a mental or physical impairment that "substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k). Dr. Roth's medical record included mainly Dr. Parmet's diagnosis and Parmet's correspondence with other doctors which, as discussed before, does not suggest that Dr. Roth's impairment was significantly limiting. On the other hand, since 1990 Dr. Roth's medical school did classify him as being a visually impaired student who is covered by the Rehabilitation Act, and granted him accommodations. Additionally, in June 1991 the National Board of Medical Examiners treated Dr. Roth as a disabled student, and allowed him accommodations in connection with examinations in 1991.[17] Dr. Roth alleges that he submitted the record of his alleged disability to Dr. Kraut shortly after the residency program interview in 1993 and thus, that such record was contained in his application file for the selection committee's review. However, there is no evidence in this record that supports Dr. Roth's assertion that Dr. Kraut included the supplemental materials in Roth's application file. In fact, according to the testimony of Dr. Kraut and the other members of the resident selection committee which the district court found to be credible, only Dr. Kraut was aware of Roth's alleged disability when the first selection committee made the decision not to rank Roth. The district court did not consider whether Dr. Roth's record of having been classified as a disabled student is sufficient to fall within the statutory definition of "disability" given that only Dr. Kraut had seen the

record. The district court also did not evaluate whether such a record, when coupled with Dr. Roth's own representation to Dr. Kraut that he is disabled, actually caused Dr. Kraut to "regard" him as having a substantially limiting impairment, thereby triggering the protection of the anti-discrimination laws. We similarly need not consider these issues because Dr. Roth has failed to establish that he was unfavorably ranked by the defendants solely because of his alleged disability.[18] *See Byrne,* 979 F.2d at 563; *see also Pushkin v. Regents of University of Colorado,* 658 F.2d 1372 (10th Cir.1981) (modifying the *McDonnell Douglas* burden-shifting analysis, which addresses employment discrimination claims under Title VII, for handicap discrimination claims).

Dr. Roth argues that because the selection committee merely rubber-stamped Dr. Kraut's ranking list, only Dr. Kraut's motive needs to be considered. *See Courtney v. Biosound Inc.,* 42 F.3d 414, 419 (7th Cir. 1994); *Dey v. Colt Const. & Development Co.,* 28 F.3d 1446, 1459 (7th Cir.1994). Because Dr. Kraut admitted that he was concerned about being influenced by knowledge of Roth's disability and "that wouldn't be fair to Dr. Roth," Roth's argument continues, the testimony provided direct evidence of discrimination. Dr. Roth's argument fails for several reasons. Although Dr. Kraut was the one who prepared the preliminary ranking list, Roth's statement that the selection committee simply rubber-stamped Dr. Kraut's ranking list is untrue. As Roth concedes, adjustments were made to the preliminary list, and in fact, Roth was excluded from the preliminary list by the first selection committee, which was consisted of approximately ten members.

The district court could and did reasonably infer that Dr. Kraut's admitted concern about being fair and impartial only worked to

---

17. Similarly, the Department of Education found that Dr. Roth is "disabled" under the ADA and the Rehabilitation Act. The finding, however, was made on March 19, 1994, more than one year after the events described in Dr. Roth's complaint, and thus, could not have been the motivating factor behind the defendants' alleged discriminatory acts.

18. In *Byrne v. Board of Education,* 979 F.2d 560, 563 (7th Cir.1992), we stated that a plaintiff basing her claim on the Rehabilitation Act must establish that (1) she is an individual with disabilities; (2) she is otherwise qualified; (3) she is excluded from programs solely because of the handicap; and (4) the programs from which she is excluded are operated by an agency that is federally funded.

ensure unbiased evaluation of Roth's application: Dr. Kraut told Roth not to discuss his disability with the other interviewers; he did not submit his own evaluation (which contained notations of Roth's alleged disability) to the selection committee; he placed Roth on the preliminary list so that the committee could consider whether and where to rank Roth; he refused to discuss Roth's alleged disability with the other committee members until such time as the committee had decided not to rank Roth. In fact, it was not until the committee made the decision not to rank Roth that Dr. Kraut informed the committee of Roth's alleged disability out of concern that the committee's decision not to rank Roth might prompt Roth to pursue legal action against LGH.

Based upon the record before us, it is quite clear that the district court could find that LGH was willing to accommodate Roth, given Dr. Kraut's credible testimony that he consulted with the administrator of LGH's residency program concerning accommodating Roth and was informed that accommodation could be arranged, in the same manner LGH had accommodated a deaf resident with a full-time interpreter. In fact, given Dr. Kraut's testimony that he was concerned about Dr. Roth being eliminated from the ranking list by the committee based on one bad interview and Dr. Roth's inclination to pursue legal action, the district court could reasonably infer that the selection committee was reconvened to *include* Roth on the list precisely because of LGH's desire to accommodate Roth as well as its interest in avoiding threatened lawsuits, which can hardly be considered a discriminatory act.

■ In any event, Dr. Roth has failed to rebut LGH's legitimate, non-discriminatory reason for its ranking decision. *See Courtney,* 42 F.3d at 420 (if employee cannot establish that a discriminatory reason more likely motivated the employer, she must offer evidence demonstrating that the employer's proffered non-discriminatory reasons are un-

worthy of credence); *Oxman v. WLS–TV,* 846 F.2d 448, 456 (7th Cir.1988). Even if we were to assume according to Roth's testimony that he had excellent academic credentials and favorable reviews by other LGH faculty members, Dr. Roth does not dispute that one of the interviewers, Dr. Hetland, strongly recommended against his admission to the program because of his apparent personality shortcomings. Dr. Hetland wrote in the evaluation that Roth was "the most insolent and arrogant resident applicant that [he] had ever interviewed", and that he "cannot imagine working with Mr. Roth in a supervisorial role." Dr. Hetland's evaluation was read to the selection committee. Additionally, another interviewer, Dr. Metrick, wrote in the evaluation that he was concerned "as to how interested [Roth] would be in functioning as a resident." Given the committee members' negative evaluations of Roth as a result of their individual and respective interview sessions, the district court might very well have concluded that the committee's initial decision not to rank Roth was motivated by its concern about Roth's attitude, maturation, and questionable personality traits, rather than by any alleged prejudice on the part of Dr. Kraut.[19] Indeed, the committee's consideration of, and emphasis on, Roth's non-academic qualifications or lack thereof was certainly legitimate in the determination of Roth's fitness as a resident. Under the directive of the American Medical Association, residency programs should "select from among eligible applicants on the basis of their preparedness and ability to benefit from the program" by considering the applicant's "aptitude, academic credentials, *personal characteristics, and ability to communicate ...*" *See Graduate Medical Education Directory 1993–1994,* p. 15 (1993) (emphasis added). Moreover, the idea that a resident must have good interpersonal and communication skills so as to adequately meet patient needs is evident in the requirements for accreditation of residency pro-

---

**19.** *Cf. Shager v. Upjohn Co.,* 913 F.2d 398, 405 (7th Cir.1990) (finding that material fact issue exists as to whether employer's committee discharged employee for reasons untainted by employee's supervisor's alleged discriminatory animus where the supervisor portrayed employee's performance to the committee in the worst possible light, committee's deliberations on the question of whether to fire employee were brief or perhaps perfunctory, and no member could remember having considered the issue).

grams as set forth by the American Medical Association. The "Requirements for Accreditation" heavily emphasize the importance of a resident's personal and professional development, including the development of professional attitudes consistent with being a physician. *Id.* at 9–15. For instance, the preface to "Requirements for Accreditation" states that the "single most important responsibility" of any residency program is to provide a program such that it facilitates "the resident's professional and personal development while ensuring safe and appropriate care for patients." *Id.* at 9. The preface further instructs that a program must maintain a proper balance between patient care needs and educational objectives. *Id.* Additionally, a residency program director must regularly evaluate a resident's development of professional attitudes, and should advance the resident to a position of higher responsibility only on the basis of evidence of his or her "satisfactory progressive scholarship and professional growth." *Id.* at 14. Dr. Roth has failed utterly to rebut LGH's valid, non-discriminatory reasons of his character flaws, and thus, he has failed to meet the threshold burden of demonstrating some likelihood of success on his discrimination claim. *See Gateway Eastern Ry. Co. v. Terminal R.R. Ass'n,* 35 F.3d 1134, 1137 (7th Cir.1994) ("As a threshold matter, the moving party must establish that it has some likelihood of success on the merits."); *Erickson,* 13 F.3d at 1067; *Abbott Lab.,* 971 F.2d at 11.

### 2. Retaliation

We move on, then, to Roth's claim of retaliation. To establish a prima facie case of retaliation, Dr. Roth must establish that (1) he engaged in statutorily protected expression; (2) he suffered an adverse action; and (3) there is a causal link between the protected expression and the adverse action. *Dey,* 28 F.3d at 1457; *Holland v. Jefferson Nat. Life Ins. Co.,* 883 F.2d 1307, 1313 (7th Cir.1989). To ultimately prevail Dr. Roth must also rebut the defendants' non-discriminatory reasons for the adverse action and establish that a discriminatory motive was the determining factor behind the defendants' action. *See Rennie v. Dalton,* 3 F.3d 1100, 1108–09 (7th Cir.1993), *cert. de-*

*nied,* —— U.S. ——, 114 S.Ct. 1054, 127 L.Ed.2d 375 (1994); *see also Saint Mary's Honor Ctr. v. Hicks,* —— U.S. ——, ——––——, 113 S.Ct. 2742, 2747–49, 125 L.Ed.2d 407 (1993).

It is undisputed that LGH refused to give Dr. Roth an application for its 1994 residency program, and thus ultimately did not rank Roth in the 1994 Match. Although the defendants stated that their reason for refusing to allow Dr. Roth to apply was due to concerns about Dr. Roth's attitude, maturation and questionable personality traits, it also appears that LGH's refusal was related to Dr. Roth's discrimination suit. Dr. Kraut wrote,

> In view of the litigation which you have filed against this hospital and the members of the Pediatric Post-graduate Medical Education Program Selection Committee and the accusations you have made in connection with the lawsuit, we must respectfully decline your request [for an application].

The district court found, however, that there was no retaliatory motive on the part of the defendants. Focusing on the district court's statement that "[t]he protected act is the act of assertion ... not the underlying facts asserted," Dr. Roth argues that the district court's ruling was improperly based on his protected acts of making allegations against the defendants. Admittedly, the case law suggests that a plaintiff's allegations or accusations made in connection with the filing of a lawsuit is protected, even if the challenged conduct ultimately is found to be lawful. *See Alexander v. Gerhardt Enterprises, Inc.,* 40 F.3d 187, 195 (7th Cir.1994); *Dey,* 28 F.3d at 1456–58; *Holland,* 883 F.2d at 1314; *Jennings v. Tinley Park Community,* 796 F.2d 962, 967 (7th Cir.1986), *cert. denied,* 481 U.S. 1017, 107 S.Ct. 1895, 95 L.Ed.2d 502 (1987); *Berg v. La Crosse Cooler Co.,* 612 F.2d 1041, 1045–46 (7th Cir.1980). However, to receive protection, a plaintiff must file the lawsuit and make the accusations underlying the lawsuit in good faith and with a reasonable and sincere belief that he or she is opposing unlawful discrimination. *Dey,* 28 F.3d at 1458; *Jennings,* 796 F.2d at 967; *Rucker v. Higher Educ. Aids Bd.,* 669 F.2d 1179, 1182

(7th Cir.1982) ("it is good faith and reasonableness, not the fact of discrimination, that is the critical inquiry in a retaliation case"); *Berg*, 612 F.2d at 1045–46. Our discussion in *Holland*, 883 F.2d at 1314–15, an employment discrimination case under Title VII, is instructive:

A plaintiff raising a retaliation claim must have a reasonable belief that she is opposing unlawful discrimination "for it seems unlikely that the framers of Title VII would have wanted to encourage the filing of utterly baseless charges by preventing employers from disciplining the employees who made them."

*Id.* (quoting *Rucker*, 669 F.2d at 1182). Based upon this record, the district court could have concluded that Dr. Roth's discrimination suit was not made in good faith and that his accusations made in connection with the suit were baseless. The conclusion is supported by the district court's credibility determinations of the witnesses who appeared before him and the specific finding that Dr. Roth has repeatedly attempted to circumvent and/or manipulate the system by using his alleged disability to gain a competitive advantage. Thus, the district court did not abuse its discretion when finding that the defendants have a valid, non-discriminatory basis "to not to want to have anything to do with the plaintiff further . . . ."

## B. Irreparable Harm

Although the district court did not reach the issue, we are convinced that Dr. Roth has also failed to make the requisite showing that he will suffer irreparable harm in the absence of the preliminary injunction. *Cf. EEOC v. City of Janesville*, 630 F.2d 1254, 1259 (7th Cir.1980) ("Reinstatement pending a trial on the merits, even in cases of race or sex discrimination, is an extraordinary remedy permissible only upon a substantial showing of irreparable injury". Dr. Roth claims that the delay from being admitted to LGH results in deterioration in his knowledge and skills, psychological distress and loss of professional association. However, Dr. Roth is not foreclosed from obtaining a residency in the more than 2,000 positions available annually in more than 200 pediatric residency programs. *Cf. id.* (stating that an inability to

find other employment is not irreparable injury to justify the extraordinary relief of reinstatement). In fact, when Dr. Roth did not match with the two residency programs he ranked in 1993, he made no effort to even apply for any of the 260 pediatric residency positions still available after the Match, including four pediatric positions in Chicago. Similarly, in 1994 Dr. Roth ranked only one program where he had not previously instigated litigation, and again made no attempt to obtain any of the 160 pediatric residency positions still available after the Match. Dr. Roth argued for the first time on appeal during oral argument that LGH was a better program and that the defendants should not be allowed to hold themselves above the law by telling him to go find a program that does not discriminate. Dr. Roth's argument misses the point. To obtain the equitable remedy of admission pending the outcome of the litigation, Dr. Roth must demonstrate why he is entitled to relief now because of the irreparable injury he will suffer under the circumstances, not what damages he may ultimately recover from the defendants if he succeeds on the merits. It is not "irreparable injury" simply because he is unable to hand-pick the residency program he desires and refuses to make any reasonable effort to acquire a residency program.

## III. Conclusion

The Rehabilitation Act and the Americans with Disabilities Act are important legislation that seek to integrate disabled individuals into the economic and social mainstream, and to ensure that the truly disabled will not face discrimination because of stereotypes or their insurmountable impairments. *See* 29 U.S.C. § 701; S.REP. No. 116, 101st Cong., 1st Sess. 2 (1989). However, there is a clear bright line of demarcation between extending the statutory protection to a truly disabled individual (so that he or she can lead a normal life, *see McWright v. Alexander*, 982 F.2d 222, 227 (7th Cir.1992)) and allowing an individual with marginal impairment to use disability laws as bargaining chips to gain a competitive advantage. The district court's evaluation that Dr. Roth fell on the wrong side of the line is well-supported in this

record, and the district court's ruling under the circumstances cannot be considered clearly erroneous. There is no abuse of discretion. The judgment of the district court denying the plaintiff's request for a preliminary injunction is AFFIRMED.