Karen SMITH, Plaintiff,

v.

KITTERMAN, INC. d/b/a Kitterman Plastics, Defendant.

No. 94–0492–CV–W–3.

United States District Court,
W.D. Missouri,
Western Division.

Aug. 24, 1995.

Gene P. Graham, Jr., Rebecca Rolf, White, Allinder, Grate & Graham, Independence, MO, for plaintiff Karen S. Smith.

Martha A. Halvordson, Rose, Brouillette & Shapiro, P.C., Kansas City, MO, for defendant Kitterman, Inc. dba Kitterman Plastics, Inc.

## ORDER

ELMO B. HUNTER, Senior District Judge.

This matter is before the Court upon Defendant's Motion for Summary Judgment. The Plaintiff filed this action on May 26, 1994, alleging that her employment with Kitterman Plastics ("Kitterman") was terminated in violation of the Americans With Disability Act ("ADA"), 42 U.S.C. § 12101–12117 (1995 Supp.) (Count I) and the Missouri Human Rights Act ("MHRA"), Mo.Rev.Stat. § 213.010–213.077 (1995 Supp.) (Count II). Plaintiff also alleges that she unlawfully was terminated in retaliation for filing a workers' compensation claim in violation of Mo.Rev. Stat. § 287.780 (1983) (Count III).

## I. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if the moving party establishes that there is no genuine issue of material fact for trial and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court must consider all pleadings, depositions, affidavits, and

admissions on file and draw reasonable inferences in favor of the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Because discrimination cases often depend on inferences rather than on direct evidence, summary judgment should not be granted unless the evidence could not support any reasonable inference for the nonmovant." *Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir.1994).

## II. FACTS

Plaintiff was employed by Kitterman Plastics from June of 1968 until the Fall of 1992. During the twenty-five years she was employed by Kitterman, Plaintiff worked as an injection operator for approximately fifteen years and as a secondary operator for the remainder of her employment.

On January 27, 1989, Kitterman filed a Report of Injury with the Missouri Department of Labor and Industrial Relations after Plaintiff reported numbness in the first three fingers of her right hand. Plaintiff was diagnosed as having carpal tunnel syndrome in her right wrist and subsequently underwent surgery and therapy as treatment. Plaintiff was released to go back to work in July of 1989. Notably, the parties stipulate that Plaintiff continued to have problems with her right hand after surgery. (Def.'s Sugg. Supp. Summ. J. at 3; Pl.'s Opp. at 2).

In July of 1992, Plaintiff injured her left hand and arm in the course of her employment with Kitterman. On November 23, 1992, Plaintiff underwent surgery on her left hand.[1] Plaintiff filed a claim for workers' compensation with the Missouri Division of Workers' Compensation in May of 1993.

On June 11, 1993, Plaintiff's counsel sent a letter to Kitterman inquiring about Plaintiff's employment status. On June 16, 1993, Barry Hale, Human Relations Manager for Kitterman, sent a response to this letter requesting a doctor's report concerning Plaintiff's work restrictions. In October of 1993, Plaintiff submitted a release from her doctor that contained medical restrictions against the "use of tools requiring repetitive grasping,

sustained strong gripping and the use of small hand tools." Upon receipt of the requested doctor's report in October 1993, Kitterman informed Plaintiff that she could not return to work.

Kitterman states that the company specifically informed Plaintiff that the reason she could not come back to work was because there were no available positions that Plaintiff could perform due to her medical restrictions. Conversely, Plaintiff alleges she was never told by Kitterman any reason why there was no position for her and consequently alleges that Kitterman refused to reinstate her due to disability discrimination and in retaliation for filing a Workers' Compensation claim.

## III. DISCUSSION

The ADA prohibits discrimination against "a qualified individual with a disability because of the disability of such individual in regard to ... discharge of employees...." 42 U.S.C. § 12112(a). "A plaintiff seeking relief under the ADA must establish [1] that he is a disabled person within the meaning of the ADA, [2] that he is qualified to perform the essential functions of his job either with or without reasonable accommodation, and [3] that he was terminated because of his disability." *Wooten v. Farmland Foods*, 58 F.3d 382, 385 (8th Cir.1995) (citing *White v. York Int'l Corp.*, 45 F.3d 357, 360–61 (10th Cir.1995)).

### A. Is Plaintiff a Disabled Person within the Meaning of the ADA?

A disability is defined by the statute as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Kitterman argues in support of its Motion for Summary Judgment that Plaintiff is not a "qualified individual with a disability" because she does not have, she does not have a record of having, nor is she regarded by Kitterman as having, a physical or mental impairment *which substantially limits one or more of the major*

---

1. Plaintiff's last day of work at Kitterman prior to leaving for this surgery was October 15, 1992.

*life activities.* On the other hand, Plaintiff argues that she is a "qualified individual with a disability" because she is substantially limited in the major life activity of "working."

## 1. Does Plaintiff Have a Physical Impairment that Substantially Limits a Major Life Activity?

In order for an impairment to qualify as a disability, it must substantially limit a major life activity. According to the regulations, "major life activities" are "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i) (1995). Further, the ADA regulations contain an extensive definition of "substantially limits":

(1) The term substantially limits means:

(i) Unable to perform a major life activity that the average person in the general population can perform; or

(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1) (1995). The definition of "substantially limits" contained within the Regulations gives guidance on what is meant with regard to the major life activity of **working.** The Regulation states:

(3) With respect to the major life activity of working—

(i) The term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person *having comparable training, skills, and abilities.* The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

(ii) In addition . . ., the following factors may be considered in determining

whether an individual is substantially limited in the major life activity of "working":

(A) The geographical area to which the individual has reasonable access;

(B) The job from which the individual has been disqualified because of an impairment, and the number and types of jobs *utilizing similar training, knowledge, skills or abilities,* within that geographic area, from which the individual is also disqualified because of the impairment (class of jobs); and/or

(C) The job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographic area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes).

29 C.F.R. § 1630.2(j)(3) (1995) (emphasis added).

■ This Regulation makes clear that rejection from a single job for one employer would not constitute the relevant degree of limitation on working to fit within the definition of disabled, nor would an inability to perform a very specialized job or narrow range of jobs for any number of employers. On the other hand, an individual need not be totally incapable of performing any job in order to fit within the definition. An individual is substantially limited with regard to working "if the individual is significantly restricted in the ability to perform a class of jobs or a broad range of jobs in various classes, when compared with the ability of the average person with *comparable qualifications* to perform those same jobs." EEOC Interpretive Guide, § 1630.2(j).[2]

■ In support of summary judgment, Defendant cites to the Kentucky district court case of *McKay v. Toyota Motor Mfg.,* 878 F.Supp. 1012 (E.D.Ky.1995), as persuasive authority that individuals with carpal

---

**2.** For example, the EEOC Guide explains that a person who cannot perform any heavy labor due to a back abnormality would be substantially

limited in working because a whole class of jobs is precluded.

tunnel syndrome are not disabled as a matter of law under the ADA. This Court, however, construes this persuasive authority to more specifically hold that under the distinct facts of that case that just because an employee can no longer perform repetitive factory work does not render her significantly limited in the major life activity of working under the ADA, *given that she was a 24–year–old college graduate working on earning her teaching certificate.* The district court limited its holding to these specific facts because "[g]iven her educational background and age, she is qualified for numerous positions "not utilizing" the skills she learned as an automobile assembler." *Id.* at 1015. The facts at bar are quite different.[3]

As a preliminary matter, Plaintiff never completed high school and has no vocational or other type of job training. (Karen Smith Dep. at 18–19; Karen Smith Aff. at 1). Further, she is forty-two (42) years old and has worked at Kitterman since she was eighteen (18) years old. During the twenty-five years Plaintiff was employed by Kitterman, Plaintiff worked at only two jobs: as an injection operator for approximately fifteen years and as a secondary operator for the remainder of her employment.

Although Defendant asserts that both of the particular jobs Plaintiff has held require "repetitive motions," Defendant argues that Plaintiff's "physical impairment has not created a significant barrier to employment positions that are comparable in stature to her former positions at Kitterman." (Def.'s Sugg. at 12). In support of this argument, Defendant refers to the five jobs Plaintiff has held "where she performed different variations of manual labor and a wide range of responsibilities." *Id.*

The Court simply is not persuaded for purposes of summary judgment that Plaintiff's medical restrictions do *not* create "a significant barrier to employment in positions that are comparable in stature to her former position at Kitterman"—especially given her limited educational, training, and employment background. As to the different jobs Plaintiff has held since Defendant told her she could not return to Kitterman, there is evidence before the Court that either (1) those jobs required her to perform restricted tasks prohibited by Plaintiff's doctor in her medical release report and/or tasks that caused her pain in connection with her carpal tunnel syndrome;[4] (2) the jobs involuntarily

---

3. The issue of whether or not an individual is disabled is a factual question to be decided on a case-by-case basis. *Byrne v. Bd. of Educ.*, 979 F.2d 560 (7th Cir.1992).

4. Q. In your position at Bio Mat, is there anything that you do that causes you problems with your hands?
A. There is some things, yes.
Q. What would those things be?
A. For instance, like turning things, like the ratchet type thing. It causes pain, but I still do it, if I have to turn it really super hard.
Karen Smith Dep. at 8–9.

\* \* \* \* \* \*

Q. While you were working at Henry Wurst, did you experience any problems with either your right hand or your left hand?
A. Yes, I did at different times, yes.
Q. What type of problems did you have?
A. Well, just normal problems like I always have, pain.
Karen Smith Dep. at 12–13.

\* \* \* \* \* \*

Q. What did you do for Haldex?
A. Put brakes together.

\* \* \* \* \* \*

Q. Can you describe for me or tell me how you did that job, what was involved?

A. Yes. You had to—I guess I can tell you exactly how it was done. You had to put a lot of greasy parts together, and you had to screw them down, and you had to use an air driver to put them in. You had a lot of twisting and turning to do.
Q. Did you have any troubles with either your right hand or your left hand using the air driver?
A. Yes, I did.
Q. What about the twisting and the turning?
A. I had trouble with that.
Q. Which hand bothered you?
A. The right hand.
Karen Smith Dep. at 21–22.

\* \* \* \* \* \*

Q. [I]n October of '93, Dr. Vilmer gave you certain restrictions as far as the type of work you could perform. I was wondering if you're under any of the same restrictions today or different restrictions?
A. Well, I haven't been back to him. I do just what I have to do. I do it and if it hurts, I still do it anyway.
Karen Smith Dep. at 14.

\* \* \* \* \* \*

Q. What type of work did you do for Westport Research?
A. Electronics.

ended due to layoff;[5] or (3) the jobs were not permanent or not available full-time.[6] Not only does this evidence to which Defendant cites fail to support Defendant's proposition that Plaintiff's "physical impairment has not created a significant barrier to employment positions that are comparable in stature to her former positions at Kitterman," but it actually flies in the face of such a conclusion given Plaintiff's sworn testimony regarding the duties of the full-time and permanent jobs she actually secured. Notably, beyond Defendant's conclusory allegations to the contrary, there is no evidence before the Court to dispute Plaintiff's claim that she is significantly restricted in the ability to perform a class of jobs or a broad range of jobs in various classes, when compared with the ability of a person with *comparable training, qualifications, skills and abilities* to perform those same jobs. *See* EEOC Interpretive Guide, § 1630.2(j).

Based on the above discussion, the Court **FINDS** that there remains a material issue of fact regarding whether or not Plaintiff is significantly restricted in the ability to perform a class of jobs or a broad range of jobs in various classes, when compared with the ability of the average person with comparable qualifications to perform those same jobs. Because such a factual finding must be made in order to determine whether or not Plaintiff is disabled within the meaning of the ADA, summary judgment on this issue is not appropriate.

## 2. Does Kitterman Regard Plaintiff to Have a Physical Impairment Which Substantially Limits a Major Life Activity?

■ In further support that summary judgment is not warranted, the Court notes that a disability is also defined by the statute as being *regarded* as having a physical or mental impairment that substantially limits one or more of the major life activities of such individual. 42 U.S.C. § 12102(2)(C) (emphasis added). "A person is 'regarded as having' an impairment that substantially limits the person's major life activities when other people treat that person as having a substantially limiting impairment." *Wooten v. Farmland Foods,* 58 F.3d at 385 (citing 29 C.F.R. § 1630.2($l$)(3) (1995)). "The focus is on the impairment's effect upon the attitudes of others." *Id.* (citation omitted).

The Court finds that there is credible evidence in the record to show that Kitterman could have regarded Plaintiff as having a disability within the meaning of the ADA. As a preliminary matter, there is evidence to show that Gary Smith and Cliff Thrasher had their minds made up in early 1993 that Plaintiff would not be permitted to return to work without a 100% release from her doctor. (Bill Smith Dep. at 16–17, 43.) There is further evidence that shows Mary Alice Hig-

Q. What type of work was that?
A. We had to put boards together, electronic boards.

 * * * * * *

Q. Okay. To do this job, did you need to use small hand tools?
A. I had to use like little pliers.
Karen Smith Dep. at 32–33.

5. Q. How long did you work for Stuart Hall?
A. I think I worked for them three months.

 * * * * * *

Q. What caused you to leave Stuart Hall?
A. Layoff.

 * * * * * *

Q. [T]he work you did at Stuart Hall, was there any tasks that you performed that would cause you problems with either your right or your left hand?
A. I really didn't have anything that I had to twist or pull or—
Q. So would that mean no?
A. That would mean no.

Karen Smith Dep. at 27.

6. Q. Before Stuart Hall, where did you work?

 * * * * * *

A. Oh. Yeah, I was in Interstate Inn, and I did that basically part-time.
Q. Did any of your job duties at Interstate Inn require twisting and turning with your hands?
A. No.
Q. Did you have to use small hand tools?
A. No.

 * * * * * *

Q. Why did you leave Interstate Inn?
A. Because I needed to make more money.
Karen Smith Dep. at 27–29.

 * * * * * *

Q. Do you have any recollection as to how long you were with Westport Research?
A. I think I was with them for like a couple of months. However long the job lasted.
Q. And it was a temporary position?
A. Yes.
Karen Smith Dep. at 33.

gins overheard conversations involving Gary Smith, Cliff Thrasher and Bill Smith that Plaintiff would never return to work for Kitterman. (Mary Alice Higgins Aff. at 6–7.) Lastly, there is evidence to show that Kitterman has refused to permit Plaintiff to even attempt to perform various job duties in order to determine whether Plaintiff could perform the essential functions of any job within the company. (Karen Smith Aff. at 2).

The Court **CONCLUDES** that the evidence presented is sufficient to create a material issue of fact with regard to whether Plaintiff was "regarded [by Kitterman] as having" a disability within the meaning of the ADA.

B. Is Plaintiff Qualified to Perform the Essential Functions of the Job?

 In addition to showing she is an "individual with a disability," a plaintiff must show that she is "otherwise qualified" for the position she held in order to be entitled to the protection of the ADA. 42 U.S.C. § 12111(8). To do so, she must show that she can perform the "essential functions" of her job either "with or without reasonable accommodations." 42 U.S.C. § 12111(8); *White v. York Int'l Corp.,* 45 F.3d 357, 360–61 (10th Cir.1995); *Mason v. Frank,* 32 F.3d 315, 318–319 (8th Cir.1994). More specifically, in *Chandler v. City of Dallas,* 2 F.3d 1385 (5th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1386, 128 L.Ed.2d 61 (1994), the Fifth Circuit Court of Appeals articulated a two-part analysis to determine whether a person is "qualified" within the meaning of the ADA:

> First, we must determine whether the individual could perform the essential functions of the job, i.e., functions that bear more than a marginal relationship to the job at issue. Second, if (but only if) we conclude that the individual is not able to perform the essential functions of the job, we must determine whether any reasonable accommodation by the employer would enable him to perform those functions.

*Id.* at 1393–94; *see also School Bd. of Nassau County v. Arline,* 480 U.S. 273, 287 n. 17, 107 S.Ct. 1123, 1130–31 n. 17, 94 L.Ed.2d 307 (1987); *White v. York Int'l Corp.,* 45 F.3d at 360.

Defendant asserts in its brief that a secondary operator at Kitterman is required to saw, rivet, drill, and scrape parts of plastic products. Defendant states these functions require a secondary operator to operate hand saws, hand jacks, electrical and pneumatic hand tools, to lift and carry parts and fixtures, to perform repetitive motions, and to lift heavy objects.

Plaintiff's doctor's release submitted on October 14, 1993, contains medical restrictions against the "use of tools requiring repetitive grasping, sustained strong gripping and the use of small hand tools." Defendant contends, and Plaintiff does not dispute, that pursuant to these medical restrictions, Plaintiff could not perform the "essential functions" of a secondary operator position *without any* accommodation. Based on this information, the Court FINDS for purposes of this motion for summary judgment that Plaintiff could not perform the "essential functions" of a secondary operator position without any accommodation.

 As a result of this finding, the second step to determine whether an employee is qualified under the ADA is to determine if the employer could have made reasonable accommodations that would have allowed the employee to perform the essential functions of the job. *Chandler,* 2 F.3d at 1393–94. The ADA does not define "reasonable accommodation." The term may, however, include

> job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9)(B). Notably, the determination that a reasonable accommodation is not possible is, like the related "essential function" determination, highly fact-specific. *Hall v. U.S. Postal Serv.,* 857 F.2d 1073, 1079 (6th Cir.1988).

Defendant states in its Suggestions that Plaintiff could not have been reasonably accommodated in her position as secondary operator because the medical restrictions were against *use* of tools requiring repetitive grasping, sustained strong gripping and the *use* of small hand tools. The Court, however, is not persuaded by this conclusory assertion.

Plaintiff states in her Opposition to Summary Judgment that "[w]hile Dr. Vilmer gave plaintiff restrictions from repetitive grasping, sustained strong gripping and the use of small hand tools, Dr. Vilmer also mentions using small hand tools with larger handles can be an accommodation for someone with carpal tunnel syndrome." (Pl.'s Opp. at 14). Plaintiff goes on to state that she "can perform some functions that require repetitive actions. [She] may experience pain and have to stop temporarily, but she can repeat motions." *Id.* Plaintiff points out that reasonable accommodation in the form of larger handles on the tools and breaks of other tasks in between repetitive motions could have easily have accommodated her.

In considering whether or not an employee can perform a job with reasonable accommodation, the court in *Howell v. Michelin Tire Corp.*, 860 F.Supp. 1488 (M.D.Ala.1994), concluded that "reasonable accommodation can include job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition of [modified] equipment or devices . . . and other similar accommodations." 860 F.Supp. at 1492 n. 8 (citing 42 U.S.C. § 12111(9)(B)). Notwithstanding the fact that the ADA does not require an employer to promote a disabled employee as an accommodation, to reassign the employee to an occupied position, or to create a new position to accommodate the disabled worker, 29 C.F.R. § 1630.2(*o*) (1995), the Court must reject Defendant's conclusory declaration that Kitterman could not have provided Plaintiff a reasonable accommodation based on the available accommodations discussed above. Accordingly, the Court now **FINDS** that whether Plaintiff is "otherwise qualified"—in other words, in this case whether Kitterman could have reasonably accommodated Plaintiff through job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition of modified equipment or devices, etc.,—is clearly a question of fact for trial.

## C. Retaliation

█ Section 287.780 of the Missouri Workers' Compensation Act provides all employees, including at will employees, a cause of action against a former employer for damages if that employee was either discharged or discriminated against for exercising rights provided under the Act. *Dake v. Tuell*, 687 S.W.2d 191, 193 (Mo. banc 1985). Plaintiff alleges in Count III that Kitterman terminated her in retaliation for filing a Workers' Compensation claim. In its Suggestions in Support of Summary Judgment, Kitterman states that it discharged Plaintiff because she was no longer able to perform the essential functions of her job.

█ To establish a retaliatory discharge claim under Mo.Rev.Stat. § 287.780, Plaintiff must establish that (1) she was an employee of Kitterman before the injury; (2) she exercised a right granted to her pursuant to Section 287.780; (3) Kitterman discharged her; and (4) there was a causal relationship between Plaintiff's actions and the discharge. *Hansome v. Northwestern Cooperage Co.*, 679 S.W.2d 273, 275 (Mo. banc 1984). The first three elements are not in dispute.

As the facts above denote, Plaintiff filed a claim for workers' compensation with the Missouri Division of Workers' Compensation in May of 1993. On June 11, 1993, Plaintiff's counsel sent a letter to Kitterman inquiring about Plaintiff's employment status. On June 16, 1993, Barry Hale, Human Relations Manager for Kitterman, sent a response to this letter requesting a doctor's report concerning Plaintiff's work restrictions. In October of 1993, Plaintiff submitted a release from her doctor that contained certain medical restrictions. Upon receipt of the report in October of 1993, Kitterman informed Plaintiff that she could not return to work.

█ Notably, the proximity in time between the employee's exercise of her Workers' Compensation rights and the employee's discharge is one factor to be considered in determining causality. *Reed v. Sale Memo-*

*rial Hosp. and Clinic*, 698 S.W.2d 931, 935 (Mo.Ct.App.1985). Accordingly, the close proximity in time [7] between Plaintiff's filing of her Workers' Compensation claim and Kitterman's refusal to allow her to return to work weighs in favor of causality. Other evidence supporting causality is the testimony of Alan Martin, submitted to the Court in an Affidavit, relating to a phone call to Kitterman regarding Plaintiff in which he was told that Plaintiff had filed a Workers' Compensation claim, had problems with her hands, and was not currently working for Kitterman. Given this evidence, and the prevailing dispute of material fact regarding whether or not Kitterman discharged Plaintiff because she was no longer able to perform the essential functions of her job, summary judgment is not proper on this retaliation claim.

### IV. CONCLUSION

Accordingly, it is hereby **ORDERED** that Defendant's motion for summary judgment is **DENIED.**

**IT IS SO ORDERED.**

---

**7.** In reality, less than a month elapsed between the time the claim was filed and the first time Kitterman refused to allow Plaintiff to come back to work, notwithstanding the fact that Kitterman claimed its refusal was based on the fact that it wanted a doctor's release.