**Elizabeth T. GARZA, Plaintiff,**

v.

**ABBOTT LABORATORIES, Defendant.**

**No. 95 C 3560.**

United States District Court,
N.D. Illinois,
Eastern Division.

Sept. 12, 1996.

James Gerard Bradtke, Jennifer Kay Soule, Kelly K. Lambert, Soule & Bradtke, Chicago, IL, for Elizabeth T. Garza.

James M. Gecker, Julie L. Helenbrook, Katten, Muchin & Zavis, Chicago, IL, for Abbott Laboratories.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

Plaintiff Elizabeth Garza brings this action against defendant Abbott Laboratories, alleging that Abbott discriminated against her and then retaliated against her in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* (1996). Garza alleges that Abbott discriminated against her by refusing to accommodate her after she developed a condition in her arms that restricts her ability to perform certain manual tasks, including operating a keyboard. Garza further alleges that Abbott retaliated against her after she requested accommodations, by steering her towards positions outside of Abbott, denying her access to Abbott's Internal Placement System ("IPS"), and eventually terminating her employment. Garza timely filed a charge of discrimination with the Equal Opportunity Employment Commission on June 6, 1994, and that agency issued her a Notification of Right to Sue on April 12, 1995. Garza then filed this action in federal court. Abbott's motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure is presently before the court.

### RELEVANT FACTS [1]

*Garza's Employment with Abbott*

Abbott Laboratories produces and distributes hospital and health care products, employing over 14,000 people at its headquarters in Lake County, Illinois. Def.'s Facts ¶ 2; Pl.'s Add'l Facts ¶ 77. Garza was hired in 1991 and was subsequently promoted to the position of Customer Service Administrator ("CSA") in the Health Systems Division. *Id.* ¶ 3. Garza's duties as a CSA involved communicating with customers on a telephone headset and simultaneously utilizing a computer system called the Corporate Order Processing System ("OPS") to input customer information or locate information requested by the customer. *Id.* ¶ 4. The CSA position required approximately 7.5 hours of keyboarding per day. *Id.* ¶ 6.

On December 2, 1992, Garza notified her supervisor, Donna Wallace Pasquesi, that she was experiencing pain in her right hand. *Id.* ¶ 7. On December 16, 1992, Garza reported to the Employee Health Department ("EHD"), which restricted her duties to 30 minutes of keyboarding followed by 30 minutes of rest. *Id.* ¶ 8. Later that month EHD reported that Garza could return to her normal duties with 10 to 15 minute breaks as needed. *Id.* ¶ 9. Abbott allowed Garza to work within these recommended restrictions. Garza's pain was eventually attributed to interosseous nerve syndrome, which is a permanent condition affecting the nerves in the hands and forearms; she also exhibited symptoms of reflex sympathetic dystrophy. Def.'s Facts ¶ 10; Garza dep. at 46, 49; Pl.'s Add'l Facts ¶ 1.

Garza underwent surgery in January of 1993 on her right index finger to remove a cyst, and in April of 1993 on her right forearm to alleviate pressure on her nerves caused by the condition. Def.'s Facts ¶¶ 11, 14; Garza dep. at 281, 288. In the months between the two surgeries, Abbott provided Garza with a flexible work schedule, assigned her light duty tasks as available, and allowed her to take rest breaks as needed. Def.'s Facts ¶¶ 12, 13. Abbott allowed Garza to take time off and held her job open for her.

---

1. The following undisputed facts are drawn from the parties' statements of material facts and the supporting exhibits. Pursuant to Local General Rule 12(M)(3) of the Local General Rules of the United States District Court for the Northern District of Illinois, Abbott filed a statement of material facts as to which it contends there was no genuine dispute. This statement will be cited as "Def.'s Facts ¶ __." As required by Local Rule 12(N)(3)(a), Garza filed a response to Abbott's statement (cited as "Pl.'s Resp. ¶ __") designating the facts as to which there was disagreement. Garza also filed a statement of additional facts as allowed by Local Rule 12(N)(3)(b), cited as "Pl.'s Add'l Facts ¶ __."

Abbott filed a motion to strike certain portions of Garza's response and statement of additional facts. That motion was resolved in an Order of this Court dated August 28, 1996. The facts set forth herein are in conformity with that Order.

*Id.* ¶ 14. Throughout the next several months, whenever Abbott allowed Garza to work partial days due to her disability, the portion of the day that she did not work was counted against her for purposes of calculating the one-year time period after which Abbott would terminate her. Pl.'s Add'l Facts ¶ 184. Garza returned to work in her CSA position on June 1, 1993, but reported pain brought on by continuous keyboard entry. Def.'s Facts ¶ 15. On that day, Garza reported to the EHD and they restricted her to light-duty, non-repetitive work. *Id.* ¶ 16. Abbott sent Garza home but kept her job open during her absence, continuing to pay her salary during this period. *Id.;* Garza dep. at 375–76. Garza returned to work two weeks later on June 14, 1993, with a restriction from EHD that she do order entry for no more than four hours a day, but again reported that she experienced pain. Def.'s Facts ¶ 17. On June 17, 1993, Garza received a restriction from EHD of no repetitive motion. Pasquesi Decl. ¶ 11. For several weeks thereafter, Garza remained off work. Abbott paid her salary and held her job open for her during this time. Def.'s Facts ¶ 18. Garza returned to work on August 30, 1993, again on a four hour schedule, but she continued to experience pain. *Id.* ¶ 19. On September 2, 1993, EHD restricted her to no keyboard entry. *Id.* ¶ 20.

Garza performed no work for Abbott after September 2, 1993. *Id.* On November 23, 1993, Dr. Michael Oster, a physician at EHD, determined that Garza could not type more than 1.5 minutes continuously. *Id.* ¶ 23. Garza could not, without accommodation, perform the essential functions of her CSA job with the 1.5 minute typing restriction. *Id.* ¶ 24; Garza dep. at 352. On an EHD recommendation form, Oster suggested accommodations that might allow Garza to continue to work for Abbott, including an ergonomic assessment of Garza's work area and a split keyboard, a voice activated computer, and a transfer to a new position. Def.'s

Facts Ex. 16. Dr. Oster made these recommendations without any knowledge of Abbott's computer system. Def.'s Facts ¶ 26.

Garza presented these suggestions to her supervisor, Pasquesi. Pl.'s Add'l Facts ¶ 43. Pasquesi told Garza that she was no longer Garza's supervisor and that Garza should take the recommendation form with the suggestions for accommodation to Sue Hart–Wadley, a Human Resources Specialist with responsibility for Abbott's Health Systems Division. *Id.* She also said that Hart–Wadley would handle these types of things for Garza in the future.[2] *Id.* In November, 1993, Garza gave the form to Hart–Wadley, and Hart–Wadley agreed to contact Abbott employees concerning the three suggestions. Hart–Wadley Decl. ¶¶ 3–4.

*Split Keyboard*

Shortly after receiving the suggestions from Garza, Hart–Wadley contacted Nancy Liaboe, manager of Abbott's Safety/Industrial Hygiene Department, regarding the usefulness of a split keyboard.[3] Def.'s Facts ¶ 28. Liaboe told Hart–Wadley that existing research failed to demonstrate that split keyboards were beneficial to persons with repetitive motion restrictions. *Id.* ¶ 29.

Liaboe opines that a split keyboard would not have assisted Garza in performing the essential functions of her job, i.e., keyboarding for 7.5 hours per day. *Id.* ¶ 30. Garza considers it possible that she may have been able to perform her job with a split keyboard, Pl.'s Resp. ¶ 30, but she has never been allowed to test this possibility. Garza dep. at 316–19.

*Voice Activated Software*

Garza alleges that Hart–Wadley initially told her, in response to her request for voice activated software, that "Abbott doesn't do this" and that if Abbott did that for Garza, then they would have to do it for everyone. Pl.'s Add'l Facts ¶ 44. Hart–Wadley denies making these statements. Hart–Wadley dep. at 110–11. Hart–Wadley contacted

---

**2.** Hart–Wadley was not Garza's supervisor at any time. It appears that, following Garza's extended absences from Abbott, no one took responsibility to act as Garza's supervisor. Pasquesi dep. at 36–37.

**3.** Separately, someone at Abbott inquired about the ergonomics of Garza's workstation at some point, although the date(s) and extent of the inquiry are unclear. *See* Pasquesi dep. at 45–46; Garza dep. at 313–14.

Gary Lazerus, Director of Human Resources for Abbott's Health Care Division, regarding Garza's request for a voice activated computer, who in turn contacted Michael Kirn, Director of the Management Information Systems group. Def.'s Facts ¶¶ 31–32.

In late 1993 or early 1994, Kirn met separately with Don Pacholczak, Manager of Technical Planning and Assessment, and Bob Becofske, Manager of OPS, to discuss the feasibility of implementing voice activated computer software. Id. ¶¶ 33, 37. At his meeting with Kirn, Pacholczak demonstrated a voice recognition system that Abbott possessed at the time. Id. ¶ 34. The demonstration revealed that the system had poor word recognition and accuracy. Id. Pacholczak also told Kirn that Abbott would have to construct a special computer program for the voice recognition software. Id. ¶ 36. Garza contends that the program demonstrated for Kirn did not represent the full capability of voice recognition software available at the time, and that Pacholczak did not "train" the computer to work with his voice as necessary for full efficiency of the software. Pl.'s Resp. ¶¶ 34–35.

At the Kirn–Becofske meeting, Becofske told Kirn that extensive modifications would have to be made to OPS in order for voice activated software to work with it. Def.'s Facts ¶ 37. Becofske estimated in late 1993 or early 1994 that the cost of integrating the voice activated software with OPS would be over $1 million.[4] Id.

Kirn reported the information he learned from Pacholczak and Becofske to Lazerus. Id. ¶ 38. Based on this information, Lazerus concluded that voice activated software was not a feasible accommodation and reported this conclusion to Hart–Wadley. Id. ¶ 39.

*Transferring Garza to a New Position Within Abbott*

Abbott has a policy of hiring from within the company before hiring from the outside. Pl.'s Add'l Facts ¶ 181. Abbott operates an Internal Placement Service ("IPS") to assist Abbott employees in securing transfers or promotions within the company. Def.'s Facts ¶ 54. Garza had used this system to obtain her CSA position and was familiar with it. Id. ¶ 56. It is Abbott company policy that the employee has the sole responsibility to initiate the IPS process. Id. ¶ 55.

Abbott policy required an IPS form to be filled out in order for the employee to be placed on the IPS system. Hart–Wadley Decl. ¶ 8; Hart–Wadley dep. at 63–64. The IPS form required the employee's manager to give written permission for the employee to be placed on the IPS system, and required the department manager to describe the employee's abilities as well as restrictions. Hart–Wadley Decl. ¶ 8; Hart–Wadley dep. at 63–64; *see* Pl.Ex. 22.

Abbott asserts that Lazerus and/or Hart–Wadley instructed Garza to fill out an IPS form in November, 1993, January, 1994, and March, 1994. Hart–Wadley dep. at 145; Def.'s Facts ¶¶ 59, 66. Garza denies that Hart–Wadley told her to fill out an IPS form at the November 1993 meeting, and claims that when she first presented the request for re-assignment to Hart–Wadley at that meeting, Hart–Wadley told her that there were no jobs available at Abbott that did not require keyboarding. Pl.'s Add'l Facts ¶¶ 45, 48. Garza states that she did not fill out the IPS form after the January meeting with Lazerus because there was a question about who should fill out the section of the form relating to her restrictions, and Lazerus told her to wait until Hart–Wadley could assist her. Id. ¶ 47. (Garza had been referred for functional capacity testing by Dr. Harris, a doctor designated by Abbott's insurance company. *See* Def.'s Facts Ex. 20, March 6, 1996 Rpt. at 1.) Garza claims that in her meeting with Hart–Wadley and Steiner on March 18, 1994, Hart–Wadley told her that after Abbott received the functional testing approval from Dr. Harris, Hart–Wadley would help her fill out the IPS form, especially the portion describing the employee's restrictions. Pl.'s Add'l Facts ¶¶ 54–55. Ultimately, Garza did

---

4. Plaintiff disputes that this estimate was ever made. Pl.'s Resp. ¶ 37. There is evidence that a $1 million dollar estimate was given at about this time, but there is also evidence that the inquiry consisted solely of Becofske's off-hand opinion. *See* Perez dep. at 19–20; Becofske dep. at 9–11. Becofske's unit later issued figures corroborating this figure. Def.'s Facts ¶¶ 40–41.

not fill out an IPS form until April 12 or 13, 1994. Pl.'s Resp. ¶ 67.

In January, 1994, Hart–Wadley spoke with Cindy Perez, Abbott's IPS recruiter for the Health Care Division, about finding another job for Garza. Def.'s Facts ¶ 61. Perez discussed Garza's situation in a January IPS "priority placement"[5] meeting, but did not officially place her on the "priority placement list" because they did not have a completed IPS form. Perez dep. at 15–17. During the initial conversation in January, Perez agreed to tell Hart–Wadley if a position for Garza came up despite the lack of an IPS form. Def.'s Facts ¶ 61. Perez was familiar with Garza's restrictions, but not her qualifications. Perez dep. at 14–15, 18–19.

Perez (with whom Hart–Wadley had previously discussed Garza's request for a voice activated computer) called Hart–Wadley in February, 1994 to inquire about the voice activated computer, and Hart–Wadley told her the estimate was around $1 million. Id. at 19–20. At this time, Perez stopped looking for a job for Garza because she had no IPS form for Garza. Pl.'s Resp. ¶ 63. Perez did not discuss Garza at any further "priority placement" meetings until the fall of 1994. Perez dep. at 20–21.

In February, 1994, Dr. Harris, the physician designated by Abbott's insurer (apparently in connection with Garza's worker's compensation claim), referred Garza for a Functional Capacity Evaluation. The evaluation indicated that Garza functioned at a "sedentary" work level under U.S. Department of Labor standards. Def.'s Facts Ex. 20, March 6, 1996 Rpt. at 1. On March 16, 1994, Garza began vocational testing at Rehabilitation Consultants for Industry, Inc.

("RCI"), a vocational rehabilitation and outplacement firm, but was forced to stop due to fatigue. Garza completed this testing on March 23, 1994. Def.'s Facts Ex. 20, March 28, 1994 Vocational Testing Rpt. at 1.

On March 18, 1994, Garza met with Hart–Wadley and Dana Rubin Steiner of RCI to discuss RCI assisting Garza in her job search. Def.'s Facts ¶ 64. At no cost to Garza, Steiner assisted Garza in looking for a job outside Abbott from March to July, 1994. Id. ¶¶ 65, 83; Pl.'s Add'l Facts ¶ 38. Steiner compiled a list of 127 possible jobs for Garza,[6] all of which were outside of Abbott. Def.'s Facts ¶ 83; Pl.'s Add'l Facts ¶ 38. Abbott did not permit Garza to attempt to perform the essential functions of any job within the company. Pl.'s Add'l Facts ¶ 13. Abbott contends that it had no positions open that were within Garza's restrictions. Def.'s Facts ¶ 77.

Garza was terminated effective March 17, 1994. Def.'s Facts ¶ 70. Abbott had a policy, of which Garza was aware, which provided that any employee who had not worked for Abbott for one year would be terminated from employment.[7] Id. ¶¶ 68–69. The partial days that Abbott allowed Garza to work throughout the spring and summer of 1993 were counted against the one year period. Pl.'s Add'l Facts ¶ 184. Garza was informed on April 19, 1994 that, due to a miscalculation, she had been terminated effective March 17, 1994, rather than in late April as she had anticipated. Def.'s Facts ¶ 70.[8]

In early April, 1994, Garza believed that her termination date was approaching and knew that she had not yet received help from Hart–Wadley concerning the IPS form, so

5. Abbott employees displaced by job eliminations or similar circumstances are given special consideration for open positions by Abbott recruiters. Priority placement employees are placed on the "priority placement list" and discussed at a recruiter meeting every Friday. Perez dep. at 15–16.

6. Garza argues that few of the 127 jobs found by Steiner were within her capabilities due to the restrictions on repetitive motion and lifting. Pl.'s Resp. ¶ 83; Steinwald Aff. 3(c).

7. Nevertheless, several Abbott employees have been placed on the priority placement list for

over a year without getting a job and without being terminated. Pl.'s Add'l Facts ¶¶ 91–92.

8. The notification of Garza's termination apparently fell through the cracks. On April 6, 1994, Susie Smith, an employee in Abbott's benefits department, sent Hart–Wadley a letter stating that Garza's correct termination date was March 18, 1994. Pl.'s Add'l Facts Ex. 21. Smith had the responsibility to inform Garza of the date, but asked Hart–Wadley if she would inform Garza as Smith was going out of town and would not mail the letter until the following week. Id.

she filled out as much of the form as she could and turned it into Hart–Wadley's secretary. Garza dep. at 358–59. On April 19, 1994, the day she was notified of her termination, Garza says she spoke with Elinore Leech, Abbott's IPS administrator, to see if the IPS form she left with Hart–Wadley's secretary had been turned in, and was told by Leech that it had not been. Pl.'s Add'l Facts ¶ 56. Later that same day, Garza asked Hart–Wadley why she did not turn in the IPS form. Hart–Wadley responded that she was not Garza's manager, that she could not fill the form out, and that she did not know why Garza had given her the form. Pl.'s Add'l Facts ¶ 57 & Ex. 21. Hart–Wadley denied ever having told Garza she would handle the IPS form for her at their March 18, 1994 meeting with Steiner. Id. ¶ 57.

On April 20, 1994, Garza contacted Michael Meyer, Abbott's Director of Human Resources for Lake County, and inquired about obtaining another position within Abbott. Def.'s Facts ¶ 71. Meyer told Garza that he would look into the matter and get back to her. Id. At some point after Garza's termination, Garza's counsel sent a letter to Meyer requesting that he enroll Garza in the IPS system. Meyer dep. at 20. Meyer contacted Garza after receiving the letter. Garza dep. at 245–247. Meyer decided to allow Garza to utilize the IPS system.[9] Meyer Decl. ¶ 8. On July 19, 1994 Meyer forwarded an IPS form to Garza, who filled out the form and returned it to Meyer on July 29, 1994. Id. ¶¶ 10–11. Meyer processed the form and Garza was enrolled in IPS from August 4, 1994 to October 26, 1994. Def.'s Facts ¶ 74. Perez placed Garza on the priority placement list but did not locate any positions within Garza's qualifications and restrictions during this time. Def.'s Facts ¶ 75.

Elinore Leech, Abbott's IPS administrator, is aware of approximately 400 jobs available at Abbott. Of these, Garza would be qualified for approximately 100, but could not perform them due to her restrictions. Pl.'s Add'l Facts ¶¶ 88–89. Two Abbott employees have said that they are not aware of any positions at Abbott that Garza could have performed with her restrictions, Pasquesi Decl. ¶ 15, Meyer Decl. ¶ 13, although Hart–Wadley opined that perhaps a security guard position might have been within both Garza's qualifications and her restrictions. Pl.'s Add'l Facts ¶¶ 178–79. During February, 1994, there were three positions for security guard open within Abbott. Id. ¶ 182. Garza was not offered any of those positions and two of them appeared to go to walk-ins (people from outside Abbott). Id.

*Garza's Capabilities and Restrictions*

Garza's current physical condition is similar to when she was employed at Abbott. Def.'s Facts ¶ 78. Garza is unable to manually operate a computer, write for long periods of time, carry her daughter for long periods of time, move heavy objects, or perform tasks involving repetitive motion. Pl.'s Add'l Facts ¶ 5. Garza also experiences difficulty in performing tasks which require fine-motor skills, performing tasks which require holding her arms over her head or out in front of her, including driving a car for more than about one hour, and performing tasks that involve lifting or exerting force with her arms, such as hanging clothes. Id. Finally, Garza reports that she is unable to perform or experiences great difficulty in performing many common job related tasks, such as typing, writing, filing, using the telephone extensively, running a cash register, bagging purchases, and picking up small objects. Id.; Garza Decl. ¶ 12.

As of April 1994, Garza's educational background included a high school diploma, two years of basic coursework at the University of Wisconsin–Parkside, and a telephone skills course at Abbott. Def.'s Facts Ex. 20, March 6, 1996 Rpt. at 3. Prior to her employment at Abbott, Garza held several retail sales and secretarial jobs. Id. at 2–3. In preparation for this litigation, on March 6, 1996, Steiner prepared a list of jobs she believes Garza can perform, based on Garza's experience and education, and limitations as

---

9. Meyer claims that he allowed Garza to enter IPS because Garza may not have fully understood her responsibility to enroll in IPS and take a proactive approach to finding another job.

Def.'s Facts ¶ 72. Garza contends that Meyer's decision was made in response to the letter sent by her attorney. Pl.'s Resp. ¶ 72.

determined by the vocational testing. *Id.* at 3–5. All of these jobs are outside of Abbott. *Id.* Garza alleges that she is not able to perform most if not all of the jobs on Steiner's list, and is currently unable to perform any of the retail or clerical positions that she has held in the past, due to the restrictions resulting from her condition. Pl.'s Add'l Facts ¶ 17.

During the period from Garza's termination to January or February of 1995, Garza applied for over 700 retail and clerical jobs and received several offers. Pl.'s Add'l Facts ¶ 8. Garza accepted a job with Donna Karan, a women's clothing store, but later proved unable to perform it due to her inability to do the repetitive motions and fine motor tasks required by the job. Pl.'s Add'l Facts ¶ 16. On the recommendation of the Wisconsin Department of Vocational Rehabilitation, Garza has since returned to school. *Id.* ¶ 40. Garza is only able to attend school through the use of a voice activated computer, a temporary service to write up papers, a tape recorder, and a note-taker. *Id.* ¶ 14.

Garza brought suit against Abbott for violations of the ADA. Abbott has moved for summary judgment.

## STANDARD OF REVIEW

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). The non-movant must "make a showing sufficient to establish the existence of [the] element[s] essential to that party's case, and on which that party will bear the burden of proof at trial" in order to withstand a motion for summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

In considering a motion for summary judgment, the court considers all evidence in the light most favorable to the non-moving party and draws all inferences in that party's favor. *Schmidt v. Methodist Hosp. of Indiana, Inc.*, 89 F.3d 342, 344 (7th Cir.1996). Summary judgment may be granted if the evidence is merely colorable, or is not significantly probative, *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511, or merely raises "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). If "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine' issue for trial." *Id.* at 587, 106 S.Ct. at 1356.

In making its determination, the court's sole function is to determine whether sufficient evidence exists to support a verdict in the non-movant's favor. "Credibility determinations, the weighing of the evidence, and the drawing of reasonable inferences from the facts are jury functions, not those of a judge" deciding a motion for summary judgment. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513. In an employment discrimination suit, where credibility and intent are pivotal issues, these standards apply with added rigor. *Schmidt*, 89 F.3d at 344.

## ANALYSIS

### I. COUNT I: DISCRIMINATION

The ADA makes it unlawful for an employer to "discriminate against a qualified individual with a disability because of the disability ... in regard to job application procedures, the hiring, advancement or discharge of employees, employee compensation, job training, and other terms, conditions and privileges of employment." 42 U.S.C. § 12112(a). A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id.* § 12111(8).

In order to prevail in an ADA discrimination case, "a plaintiff must establish

(1) that she is a disabled person within the meaning of the ADA; (2) that she is qualified, that is, with or without reasonable accommodation (which she must describe), she is able to perform the essential functions of the job; and (3) that she suffered an adverse employment action because of her disability." *Weiler v. Household Fin. Corp.*, No. 93 C 6454, 1995 WL 452977 at *3, 1995 U.S. Dist. LEXIS 10566 at *7–8 (N.D.Ill. July 27, 1995); *see also Howard v. Navistar Int'l Transp. Corp.*, 904 F.Supp. 922, 927 (E.D.Wis.1995).

Abbott argues that it is entitled to summary judgment because Garza is not disabled within the meaning of the ADA and, assuming *arguendo* that she is disabled, Abbott provided her with all reasonable accommodations.

### A. Garza's Status as Disabled

"Whether or not a person is handicapped under the Act is an individualized inquiry, best suited to a case-by-case determination." *Byrne v. Board of Educ.*, 979 F.2d 560, 565 (7th Cir.1992) (interpreting the Rehabilitation Act).[10] In this case, Garza seeks to prove that she is disabled because she has "a physical or mental impairment that substantially limits one or more of [her] major life activities." 42 U.S.C. § 12102(2)(A).

Abbott does not dispute that Garza's condition constitutes a "physical impairment," i.e., a "physiological disorder, or condition, ... affecting one or more ... body systems" such as the neurological or musculoskeletal systems. *See* 29 C.F.R. § 1630.2(h)(1). Abbott contends, however, that Garza's impairment does not rise to the level of a disability because it does not "substantially limit" any of Garza's major life activities.

The term "major life activities" is not defined by the ADA. Instead, courts look to the definition of this term provided in the regulations issued to implement Title 1 of the ADA, 29 C.F.R. pt. 1630, which in turn refer to the Rehabilitation Act regulations, 34 C.F.R. § 104. *See Bolton v. Scrivner, Inc.*, 36 F.3d 939, 942 (10th Cir.1994), *cert. de-*

*nied*, —— U.S. ——, 115 S.Ct. 1104, 130 L.Ed.2d 1071 (1995). The Rehabilitation Act regulations define "major life activities" to include:

> caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working. This list is not exhaustive. For example, other major life activities include, but are not limited to, sitting, standing, lifting, reaching.

29 C.F.R. pt. 1630 app., § 1630.2(i).

As stated above, an individual may be "disabled" within the meaning of the ADA when at least one of these major life activities is substantially limited by the individual's impairment. *See Homeyer v. Stanley Tulchin Assocs., Inc.*, 91 F.3d 959, 962 n. 1 (7th Cir.1996) (a plaintiff need only show that she is substantially limited in one major life activity). The Court finds that Garza has presented sufficient evidence that she is substantially limited in the major life activity of working to withstand summary judgment, so we do not reach the issue of whether or not Garza is substantially limited in other major life activities that may be relevant here, such as lifting, reaching, performing manual tasks, or personal care.

A person is substantially limited in the major life activity of work if she is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities." 29 C.F.R. § 1630.2(j)(3)(i). Factors that should be considered in reaching this determination include the nature and severity of the impairment, the duration or expected duration of the impairment, and the actual or expected permanent or long term impact of the impairment. 29 C.F.R. § 1630.2(j)(2); *Hamm v. Runyon*, 51 F.3d 721, 725 (7th Cir.1995). "The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(i).

---

10. "The legislative history of the ADA indicates that 'Congress intended that the relevant caselaw developed under the Rehabilitation Act be generally applicable to the term 'disability' as used in

the ADA.' " *Bolton v. Scrivner, Inc.*, 36 F.3d 939, 943 (10th Cir.1994) (quoting 29 C.F.R. pt. 1630, app. § 1630.2(g)), *cert. denied*, —— U.S. ——, 115 S.Ct. 1104, 130 L.Ed.2d 1071 (1995).

Applying the standards of 29 C.F.R. § 1630.2(j), it is clear that Garza is disabled. The nature of Garza's condition reduces the strength and coordination of her hands and arms, affecting a wide variety of work related activities. For instance, she cannot type continuously for more than a few minutes. She cannot lift anything over ten or fifteen pounds. She experiences difficulty in performing many manual tasks, including filing, writing, and picking up small objects. It is uncontroverted that she was unable to perform the physical duties of a retail sales clerk at a women's clothing store. The duration of the condition is permanent. The expected long term impact is therefore that Garza is permanently disabled from performing the above work related tasks.

Abbott argues against a finding of disability on the grounds that Garza has not demonstrated that her condition restricts her from either a "class of jobs" [11] or a "broad range of jobs in various classes." For the reasons stated below, we reject this argument.

Garza's education, skills, and work experience qualify her for clerical, secretarial, and retail positions. Garza's inability to type for more than 1.5 minutes consecutively certainly bars her from the secretarial class of jobs, and from performing most clerical jobs as well. The limitations imposed by her condition also prevent her from holding down a "broad range of jobs in various classes": any job requiring keyboarding for more than 1.5 minutes, lifting, or performing manual tasks is unavailable to her. Moreover, Garza has presented evidence that she applied for over 700 clerical, secretarial, and retail positions and received only a few offers to do retail work. She accepted a retail job but proved unable to perform it due to her impairment.

Even more persuasive is the evidence Garza has produced concerning her perceived employability across the range of jobs available at Abbott. Abbott's IPS administrator stated that she knew of 100 jobs within Abbott that Garza was qualified for, but she did not think that Garza could perform any of them because of her condition. Two other Abbott employees in the Human Resources department stated that they knew of no jobs at Abbott for which Garza was qualified that she could perform with her restrictions. Only one person, Hart–Wadley, could think of a job that Garza might be able to perform. Abbott therefore finds itself in the unenviable position of arguing that Garza is an "eminently employable" person and, at the same time, that there is only one job in any class that she can perform at a company with 14,000 employees and numerous types of employment positions for which she is otherwise qualified.

Courts that have granted summary judgment to employers on the grounds that the plaintiff is not substantially limited in the major life activity of working (such as the cases cited by Abbott) have generally based their decisions on a complete lack of evidence concerning employability outside of the particular job that the individual desired to acquire or retain. These courts have concentrated on three additional factors that the EEOC says "may be considered" in connection with the major life activity of working: the geographic area to which the plaintiff has access, the class of jobs from which the plaintiff is disqualified due to the impairment, and the broad range of jobs from which the plaintiff is disqualified. *See Bolton,* 36 F.3d at 944 (plaintiff presented evidence concerning only nature and severity of impairment, nothing at all concerning the geographic area, class of jobs, or broad range of jobs); *Howard v. Navistar Int'l Transp. Corp.,* 904 F.Supp. 922, 928–29 (E.D.Wis.1995) (plaintiff was unable to do certain tasks, but did not point to a class of jobs or broad range of jobs he could not do as a result of impairment); *Czopek v. General Elec. Co.,* No. 93 C 7664, 1995 WL 374036 at *2 (N.D.Ill. June 21, 1995) (plaintiff presented no evidence that he was restricted from a class of jobs or a broad range of jobs and admitted he did not think he was disabled); *DePaoli v. Abbott Labora-*

---

11. The EEOC regulations give the following example of someone who is disqualified from a "class of jobs": "an individual who has a back condition that prevents the individual from performing any heavy labor job would be substantially limited in the major life activity of working because the individual's impairment eliminates his or her ability to perform a class of jobs." 29 C.F.R. pt. 1630 app., § 1630.2(j).

*tories,* No. 95 C 3069, 1996 WL 197685 at *8 (N.D.Ill. Apr. 22, 1996) (only evidence was "conclusory allegations" of an inability to perform assembly line work).[12] In contrast to these cases, Garza has presented evidence of her inability to work over both a class of jobs and a broad range of jobs.

Abbott also cites cases in which courts have granted summary judgment to employers, even though the plaintiff presented some evidence of being restricted from a class of jobs and/or a broad range of jobs, because the restrictions on employability were not significant enough. For instance, in *Byrne,* 979 F.2d at 565–66, the court rejected the plaintiff's claim to be disabled in the major life activity of work where her allergy to a fungus was only shown to affect her ability to teach at two high schools. There was no showing of a total inability to teach. In addition, the teacher had skills and education that would allow her to hold a wide variety of jobs. Similarly, the court in *Dutcher v. Ingalls Shipbuilding,* 53 F.3d 723, 727 (5th Cir.1995) did not consider the plaintiff's inability to climb while welding to be a significant restriction when she could perform welding tasks that did not require climbing. In *Roth v. Lutheran Gen. Hosp.,* 57 F.3d 1446 (7th Cir.1995), the plaintiff was a doctor who had strabismus (crossing of the eyes), which prevented him from performing long shifts and using certain instruments such as a binocular microscope. The court held that such limitations were not a significant restriction on his ability to practice medicine generally. *Id.* at 1455–56. Another case cited by Abbott, *McKay v. Toyota Motor Mfg., U.S.A., Inc.,* 878 F.Supp. 1012 (E.D.Ky. 1995), concerned a worker who developed carpal tunnel syndrome. Although unable to perform repetitive factory work, she was in the process of earning a teaching certificate and was qualified for many other positions that did not require the same skills as her

factory job. *Id.* at 1015. Finally, in *Best v. Shell Oil Co.,* 910 F.Supp. 405, 410 (N.D.Ill. 1995), while the plaintiff produced evidence that his leg injury prevented him from driving a certain type of gasoline delivery truck at Shell, he could drive other types of trucks at Shell as well as gasoline delivery trucks at other companies.

Garza has produced evidence of much more substantial employment restrictions due to her impairment than the plaintiffs in the above cases. Rather than being unable to perform only certain aspects of the position like the plaintiffs in *Dutcher* and *Roth,* Garza is incapable of performing her old customer service job, or any of her former jobs, at all. Her inability to type or perform other clerical tasks restricts her from clerical or secretarial employment generally, rather than with just a few employers, as in *Best* and *Byrne.* Finally, unlike the plaintiff in *McKay,* Garza was not qualified at the time of her termination for other positions that do not require typing and/or repetitive motion. Garza's impairment thus restricts her from a much broader range of employment possibilities than the plaintiffs in the above cases.

Courts have denied summary judgment when the plaintiff has produced evidence of the inability to perform several jobs within the same general classification. *See Leslie v. St. Vincent New Hope, Inc.,* 916 F.Supp. 879, 885 (S.D.Ind.1996) (plaintiff's inability to perform lifting required of a nurse's aid, dietary technician, and resident attendant at a nursing home as well as other jobs requiring use of her back was sufficient to establish significant restriction of employment in a class of jobs); *Kohnke v. Delta Air Lines, Inc.,* No. 93 C 7096, 1995 WL 505973 at *6 (N.D.Ill. Aug. 23, 1995) (inability to perform any job in the customer service agent classification demonstrated an issue of fact concerning inability to perform class of jobs); [13] *Smith v.*

---

**12.** Not all courts believe that failing to produce any such evidence is fatal to a plaintiff's claim. "[T]he types of evidence which [defendant] says the plaintiff must present concern factors that the regulation provides 'may be considered.' A plaintiff's failure to come forward with evidence that merely 'may be considered' should not ordinarily require dismissal of her case." *Leslie v.*

*St. Vincent New Hope, Inc.,* 916 F.Supp. 879, 885 (S.D.Ind.1996).

**13.** Abbott argues that *Kohnke* is not on point because it dealt with the plaintiff's record of his impairment, rather than his actual physical ability. This distinction is irrelevant to the issue addressed here: what constitutes a class of jobs,

*Kitterman, Inc.,* 897 F.Supp. 423, 427 (W.D.Mo.1995) (plastics injection operator's inability to perform repetitive motions due to carpal tunnel syndrome and limited education established an issue of fact regarding ability to perform a class of jobs and a broad range of jobs). Like the plaintiffs in these cases, Garza has produced evidence that she is unable to perform a variety of jobs she was qualified for at Abbott, as well as retail, secretarial, and clerical jobs for other employers.

Finally, the Seventh Circuit has held that "[a] court may also examine whether a plaintiff can perform or has procured other employment." *Byrne,* 979 F.2d at 565. The ability of plaintiffs to find alternate work has been a major factor in granting summary judgment to employers. *See, e.g., Roth,* 57 F.3d at 1455–56 (plaintiff's multifarious endeavors despite his impairment demonstrated that the impairment did not reach the level of a disability); *Howard,* 904 F.Supp. at 929 (plaintiff's ability to continue to perform his duties as a machine operator, albeit on a different machine than his original job, supported the court's finding that he was not disabled); *Matthews v. TCI,* No. 95 C 4096, 1996 WL 332693 at *4–5 (N.D.Ill. June 14, 1996) (although plaintiff could no longer perform jobs requiring heavy lifting, he was employed in a managerial position). Garza has produced evidence that she was unable to find employment after her termination from Abbott, with the exception of one retail job that she ultimately could not perform, due to her condition. Garza is not currently employed. Although Abbott has produced expert opinion evidence to the effect that Garza could find alternate employment, this evidence demonstrates only that a factual dispute exists between the parties on this issue.

We find that Garza has met the burden of producing evidence supporting her claim that she is significantly restricted in the ability to work in both a class of jobs and a broad range of jobs as compared to people with comparable skills and training, and has shown that there is a genuine issue of material fact as to whether she is disabled. Accordingly, we must deny Abbott's motion for summary judgment on the issue of Garza's disability.

*B. Reasonable Accommodation*

Under the ADA, an employer discriminates when it does "not mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of [its] business." 42 U.S.C. § 12112(b)(5)(A).[14] "Reasonable accommodation" means measures such as "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, ... and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B). The types of accommodations sought by Garza, i.e., a split keyboard, a voice activated computer, and/or another position within Abbott, are thus within the realm of accommodations that may be required if providing them is reasonable and does not "impose an undue hardship" on the employer.

The practical application of the terms "reasonable accommodation" and "undue hardship" is discussed at length in *Vande Zande v. Wisconsin Dep't of Admin.,* 44 F.3d 538 (7th Cir.1995). There, the court held that "accommodation" means that "[t]he employer must be willing to consider making changes in its ordinary work rules, facilities, terms, and conditions in order to enable a disabled individual to work." *Id.* at 542. A "reasonable accommodation" is one that is both ef-

and what constitutes a disqualification from a class or jobs and/or a broad range of jobs.

**14.** The issue of reasonable accommodation is also germane to the question of whether an employee such as Garza is a "qualified individual with a disability." As discussed above, in order to establish a prima facie claim of discrimination under the ADA, Garza must demonstrate in part that she is a "qualified individual with a disability," i.e., "an individual with a disability who, with or without *reasonable accommodation,* can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8) (emphasis added).

fective in allowing the employee to perform the essential functions of her job, and cost-effective, in that the costs to the employer do not greatly exceed the benefits to the employer and employee. *Id.* at 543 ("The employee must show that the accommodation is reasonable in the sense both of efficacious and of proportional to costs."). The court noted that exact figures for the cost-benefit calculation need not be supplied:

> It would not follow that the costs and benefits of altering a workplace to enable a disabled person to work would always have to be quantified, or even that an accommodation would have to be deemed unreasonable if the cost exceeded the benefit however slightly. But, at the very least, the cost could not be disproportionate to the benefit.

*Id.* at 542.

"Undue hardship" is defined by the ADA as "significant difficulty or expense." 42 U.S.C. § 12111(10)(A). In determining whether or not a proposed accommodation would impose an undue hardship, the factors to be considered include:

> (i) the nature and cost of the accommodation needed under this chapter;
>
> (ii) the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility;
>
> (iii) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and

(iv) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative, or fiscal relationship of the facility or facilities in question to the covered entity.

*Id.* at § 12111(10)(B). In examining the legislative history of "undue hardship" as used in the ADA, the court in *Vande Zande* noted that "undue hardship" is generally equated to "unduly costly," but that cost must be analyzed "in relation to the benefits of the accommodation to the disabled worker as well as to the employer's resources." *Vande Zande,* 44 F.3d at 543.

> [Thus, the costs of the proposed accommodation] enter at two points in the analysis of claims to an accommodation to a disability. The employee must show that the accommodation is reasonable in the sense both of efficacious and of proportional to costs. Even if this prima facie showing is made, the employer has an opportunity to prove that upon more careful consideration the costs are excessive in relation either to the benefits of the accommodation or to the employer's financial survival or health.

*Id.*

Under *Vande Zande,*[15] the burden is thus on the plaintiff to show that the proposed accommodations would be (1) effective in allowing her to perform the essential functions of a job, and (2) in that the costs to the employer do not greatly outweigh the benefits to the employer and employee. *Id.* The burden of demonstrating that providing accommodation would cause undue hardship is on the employer. *Id.* As in any discrimination case, the plaintiff at all times retains the

---

15. *Vande Zande* is the only Seventh Circuit treatment of this subject we were able to find. The ADA is a relatively new law that has yet to generate a solid body of caselaw, and the question of which party bears the burden of showing that a proposed accommodation is either reasonable or unreasonable (and how that is to be shown) is far from settled. *See* Bernard E. Jacques, *Reasonable Accommodation and Undue Hardship: Different Circuits, Different Approaches,* Fed.Law., Aug. 1996, at 20. *Cf. Benson v. Northwest Airlines, Inc.,* 62 F.3d 1108, 1112 (8th Cir.1995) (the plaintiff must make " 'a facial showing that reasonable accommodation is pos- sible,' [at which point] the burden of production shifts to the employer to show that it is unable to accommodate the employee. If the employer shows that the employee cannot perform the essential functions of the job even with reasonable accommodation, the employee must rebut that showing with evidence of his individual capabilities.") (citations omitted); *White v. York Int'l Corp.,* 45 F.3d 357, 361 (10th Cir.1995) (applying same analysis); *Borkowski v. Valley Cent. Sch. Dist.,* 63 F.3d 131, 138 (2d Cir.1995) (Rehabilitation Act case); *Barth v. Gelb,* 2 F.3d 1180, 1187–88 (D.C.Cir.1993) (Rehabilitation Act).

burden of proving that she has been the victim of illegal discrimination.

### The Reasonableness of Abbott's Accommodations

Abbott provided Garza with time off, amended work schedules, and other related accommodations during her employment. The parties do not dispute that these accommodations were ineffective in that they did not allow Garza to continue performing the essential functions of her job. Garza further requested that Abbott provide her with a split keyboard, voice activated computer software, or a transfer to a new position; Abbott did not provide Garza with these accommodations. Using the framework provided by *Vande Zande,* Garza must produce sufficient evidence to demonstrate an issue of fact as to whether or not at least one of the three accommodations requested by Garza was reasonable in order for her claim to survive summary judgment.

#### Split Keyboard

■ Nancy Liaboe, the Manager of Abbott's Safety/Industrial Hygiene Department, testified that the existing research demonstrated that split keyboards did not assist individuals with repetitive motion restrictions in performing their jobs. Abbott has therefore produced evidence that the split keyboard was not a reasonable accommodation in that it would not aid Garza in performing the essential functions of her job, i.e. typing 7.5 hours per day. In response, Garza testified that she was not sure if she could perform her job with the split keyboard or not, but she felt she should have been allowed to try. This testimony is simply speculation, however, and as such it is insufficient to show any genuine issue of fact for the jury regarding the effectiveness of a split keyboard in enabling Garza to perform her job. Therefore, as a matter of law, this Court finds that Garza has failed to show that the split keyboard is a reasonable accommodation.

#### Voice Activated Computer Software

After receiving a request from Garza, Abbott investigated the use of a voice activated computer for her position. Abbott's inquiry resulted in an estimate in late 1993 or early 1994 that implementing voice activated software would cost over $1 million. Additional investigation suggested that implementing such software would require many days of work by Abbott's computer specialists, and might not effectively allow Garza to perform her job due to its slow and inaccurate processing of speech. These conclusions reflected the following facts and assumptions regarding Abbott's then existing computer system and voice activated software.

The Abbott OPS system used by Garza in her former job ran on a "dumb" terminal, a computer terminal attached to Abbott's mainframe, rather than a personal computer. Def.'s Facts ¶ 44. A personal computer is necessary to run voice recognition software. Samek dep. at 76. According to Donald Pacholczak, the Manager of Abbott's Technical Planning and Assessment unit, a massive programming effort would be necessary to develop special commands in OPS in order to facilitate the screen switching in the personal computer necessary to replicate the multiple session set-up allowed by the dumb terminal. Def.'s Facts ¶ 44. Pacholczak also testified that if OPS could be altered to function with a personal computer, a commercially available piece of software called a terminal emulator would be needed to allow the personal computer to interface with the mainframe. *Id.*

Pacholczak also testified that in 1993–94, voice recognition software operated erratically with terminal emulators and therefore Abbott would be required to build a "bridge" program to facilitate the interaction of voice recognition software with the OPS terminal emulation program. *Id.* ¶ 45. Pacholczak opined that voice recognition software would not allow Garza to perform her job with the necessary speed, as she would have to talk separately to the customer and then the computer, and any mistake made would have to be remedied by several commands. *Id.* ¶ 47.

OPS Manager Robert Becofske testified that, given these steps, equipping OPS with voice recognition software would cost well over $1 million, taking into account the number of hours required and the internal rates normally charged for in-house computer

work. *Id.* ¶ 46. At some point in the summer of 1994, Kirn asked Becofske to document his estimate of the cost of integrating voice recognition software with OPS. *Id.* ¶ 40. Becofske created a team of employees within his department to assess the voice activation implementation procedures and costs, and that team arrived at an estimated cost of $1.4 million. *Id.* ¶ 41. Abbott argues that this cost greatly outweighs any benefits voice activation software would provide to Abbott or Garza and would impose undue hardship on Abbott.

The opinions of Becofske and Pacholczak differ sharply from those of Garza's expert, Ralph Samek,[16] regarding the process of implementing voice activated software, the cost of implementation and the effectiveness of the software available in late 1993–early 1994. Samek first opined that Garza would be able to perform her job effectively with a voice activated computer. He testified that there is no evidence to suggest that OPS would respond any differently to keystrokes issued verbally or initiated through the keyboard. Samek Rpt. ¶ 2; Pl.'s Add'l Facts ¶ 149. Samek did not think that it would take the OPS system any longer to process an order coming from a personal computer than it would take to process an order coming from a dumb terminal. *Id.* Samek also testified that, in 1993–94, voice recognition software was capable of speeds of 50–55 words per minute with at least 98 percent accuracy and that voice entry can be faster than keyboard entry because most people don't type at a continuous rate of 50–55 words per minute. Samek dep. at 38, 115. Garza currently has a computer at home on which she successfully uses voice recognition software. Pl.'s Add'l Facts ¶ 10.

Samek's assessment of the steps necessary to integrate voice activated software with the OPS system, and the resulting estimate of costs, also varies from Abbott's. Samek noted that there had been testimony that personal computers, at least in some capacity, were already hooked up to OPS at that time. Pl.'s Resp. ¶ 48; Samek Rpt. ¶ 2. Samek further testified that OPS would not have to be altered in any way to work with a personal computer. Pl.'s Add'l Facts ¶ 147. Finally, Samek testified that, in 1993–94, it would have cost $9,500 to allow Garza to operate Abbott's OPS with voice recognition software, based on the cost of a personal computer ($3,500) with the requisite memory ($1,000), a terminal emulator ($500), the cost of the software ($3,000 in 1993), and two days of training at $500 a day. Pl.'s Add'l Facts ¶ 157; Samek dep. at 113. Thus, according to Samek, this accommodation would allow Garza to effectively perform her job and its benefits outweigh the costs.[17]

It is clear that there is a material factual dispute between Abbott and Garza concerning the effectiveness and cost of implementing voice activated software, and whether or not that cost would impose an undue hardship on Abbott. The parties have produced competing expert testimony on these issues, resulting in a credibility question that must be resolved by a jury. Nevertheless, Abbott argues that the Court must grant summary judgment in its favor regardless of this factual dispute. Abbott argues that, so long as Abbott's employees made their $1.4 million estimate in good faith, it does not matter whether that estimate is objectively wrong. In essence, Abbott is contending that an employer is protected from liability under the ADA as long as it had an honest belief that a requested accommodation was not reasonable, even if that accommodation in fact was reasonable.[18]

We can find no case law suggesting that this argument is correct. Rather, to the

---

16. Abbott moved to strike Samek's testimony on the ground that he was not sufficiently familiar with the OPS system or Garza's job requirements. That motion was denied in the Order dated August 28, 1996.

17. Abbott has not argued that providing voice activated software for Garza would be an undue hardship if the costs were $10,000.00 rather than $1.4 million.

18. The Court reads this argument as intended to go beyond the argument, made separately by Abbott, that Garza may not recover compensatory or punitive damages if Abbott can show that it made "good faith efforts, in consultation with the person with the disability ..., to identify and make a reasonable accommodation." *See* 42 U.S.C. § 1981a(a)(3). By its plain terms, this provision merely limits the damages recoverable in certain ADA cases and does not address the employer's overall liability. However, Abbott ap-

extent that any exists, the relevant case law contradicts this argument. In *Mantolete v. Bolger,* 767 F.2d 1416 (9th Cir.1985), an epileptic plaintiff brought suit against the U.S. Postal Service, claiming that they discriminated against her in denying her a position because of her epilepsy. As part of its defense during a bench trial, the post office argued that accommodations that would allow the plaintiff to perform the job could not be made because "they would have required the expenditures of large amounts of money" and would not have enabled the plaintiff to use the machine in question safely. *Id.* at 1420. The trial court agreed, and entered judgment for the defendants. On appeal, the defendants argued that, even if their conclusions about cost and effectiveness were wrong (the plaintiff's expert testified that the plaintiff could have used the machine safely with the installation of a plexiglass guard and the use of $30.00 pair of tongs), they had reached their conclusions in good faith and therefore those conclusions were entitled to deference.

The appellate court rejected this argument, finding that instead of this subjective good faith standard, an objective standard should be applied.

> If the requisite accommodations are not reasonable or if no accommodation can be made …, then an employer will, of course, not violate § 501 in refusing employment to the applicant. However, although it is the employer who must make a substantial gathering of necessary facts, the determination of whether the employer violated § 501 is to be made by the trial court *de novo.* Therefore, a good faith or rational belief on behalf of the employer will not be a sufficient defense to an act of discrimination.

*Id.* at 1423 (citing *Pushkin v. Regents of the Univ.,* 658 F.2d 1372 (10th Cir.1981)). Al-

though *Mantolete* involved a claim under the Rehabilitation Act, not the ADA, we have already noted that the case law developed in connection with the Rehabilitation Act may be used to guide the interpretation of the ADA. *See Vande Zande,* 44 F.3d at 542.

After searching federal case law on this subject, we cannot find any cases authorizing Abbott's attempt to apply a subjective good faith standard to the employer's determination of what accommodations are reasonable. Abbott cites *Beck v. University of Wis. Bd. of Regents,* 75 F.3d 1130 (7th Cir.1996) to support its argument, but its reliance is misplaced. *Beck* concerned an employer's effort to ascertain what specific accommodations would be useful for the plaintiff, and focused on the negotiation process described in 29 C.F.R. pt. 1630 app., in which the employee should identify for the employer the requested accommodations, and the employer should respond to those requests. The court's holding in that case concerned the narrow issue of which party should bear legal responsibility when the negotiation process breaks down. *See id.* at 1134 ("the crux of this dispute is one not clearly answered by the ADA: does the employer or the employee bear ultimate responsibility for determining exactly what accommodations are needed?"). The court's use of "good faith" in *Beck* related to the employer's duty to maintain communications in order to identify the desired accommodations. By contrast, Abbott's claim here of "good faith" relates to its own assessment of whether it was reasonable to provide three accommodations that had already been identified and specifically requested by Garza. *Beck* simply did not address "good faith" as it related to an employer's decision about whether to provide a specifically requested accommodation, and it cannot support the construction of "good faith" that Abbott seeks.

pears to be arguing just that here: that under § 1981a(a)(3) it is entirely exempt from liability if its own assessment of what accommodations were reasonable was made in good faith.

As the presence of good faith is disputed here, Abbott's separate argument on the issue of damages does not result in summary judgment on that issue. *See Kohnke v. Delta Air Lines, Inc.,* No. 93 C 7096, 1995 WL 505973 at *7 (N.D.Ill. Aug. 23, 1995) ("for Delta to prevail on its mo-

tion [for summary judgment on the plaintiff's damage claims under § 1981a(a)(3)], there must be no genuine factual dispute about the good faith of Delta's actions toward [the plaintiff]."); *see also Howell v. Michelin Tire Corp.,* 860 F.Supp. 1488, 1494 (M.D.Ala.1994) ("The very evidence that suggests that the company did not reasonably accommodate [the plaintiff] is also probative of a lack of good faith").

Nor is *Pesterfield v. Tennessee Valley Auth.*, 941 F.2d 437 (6th Cir.1991), another case cited by Abbott, applicable here. There, the plaintiff's doctor had written the employer a letter stating that "[a]t the present time, [the plaintiff] seems unable to return" to work, and noting that if the plaintiff were subjected to "the slightest hint of rejection or criticism, he becomes extremely anxious and depressed." *Id.* at 439. The doctor's first recommendation was: "As long as Mr. Pesterfield continues in his present state, retirement may be the best answer." *Id.* Ten years later, the doctor testified in deposition that he had actually believed that the plaintiff was able to return to work at that time. The trial court found that "the most reasonable interpretation of the letter was that plaintiff was not ready to return to work and that even if TVA was mistaken in its interpretation of the letter, there is no proof that TVA based its decision to terminate plaintiff on any handicap discrimination." *Id.* at 443.

Like *Beck, Pesterfield* is distinguishable and does not permit us to grant Abbott the good faith safe harbor it seeks as a matter of law. Although the *Pesterfield* court stated that the employer's good faith was relevant to its liability, the good faith at issue there concerned the employer's understanding of the extent of the plaintiff's disability—not the reasonableness of its efforts at providing requested accommodations. Moreover, the employer's understanding of the employee's disability was objectively reasonable, based upon the plain language of the doctor's letter. *Id.* at 442. *Pesterfield* cannot be read to authorize insulation from liability as a matter of law whenever an employer claims that it acted in good faith.[19]

■ The evidence produced on the issue of whether providing Garza with a voice activated computer was a reasonable accommodation presents a clear credibility question that must be resolved by a jury. We note that the necessity of considering all the evidence and drawing all the inferences in the light most favorable to Garza in the context of a motion for summary judgment is even more crucial in employment discrimination cases, where intent and credibility are pivotal issues. *Schmidt v. Methodist Hosp. of Indiana, Inc.*, 89 F.3d 342, 344 (7th Cir. 1996). Therefore, the Court denies summary judgment on this issue.

*Transfer to a Different Position within Abbott*

■ The final accommodation requested by Garza, and the final basis for her claim of disability discrimination, is the request that Abbott re-assign her to another job within Abbott that she could perform either with or without other accommodations. Abbott argues that it cannot be liable for failing to reassign Garza because there is no evidence that there were any openings for jobs that she could perform, and because Garza failed to fill out an application for the Internal Placement System (IPS) until after she had been terminated.

As to the latter argument, Garza has presented sufficient evidence to withstand summary judgment that Abbott itself contributed to her delay in completing the IPS application form. Garza first requested reassignment in November, 1993 when she learned that her disability was likely to prevent her from returning to her old position without accommodation. Garza testified that at that point Hart–Wadley told her that no positions within her restrictions were available. Garza has also testified that, at later meetings she had with Abbott employees, those employees asked or suggested that she wait to complete the form until the company doctor had had the opportunity to assess her functional restrictions. (The IPS form requires the employee's abilities and restrictions to be listed.) Moreover, Garza's old supervisor disclaimed responsibility for completing the supervisor's portion of the form, and no one at Abbott took on this responsibility. When considering a motion for summary judgment, a court must draw all reasonable inferences in the non-movant's favor. Ac-

---

**19.** Abbott cites several cases brought under other employment discrimination statutes noting that, *as to the employer's proffered non-discriminatory reason for taking the adverse employment action,* courts will inquire only whether the reason is genuine, not whether it is correct. Those cases lack relevance to the present case, in which Abbott admits that it terminated Garza based on her disability.

cordingly, we reject Abbott's argument that it is entitled to summary judgment because Garza's own conduct was the sole cause of her not being re-assigned.

As for the availability of a vacant position that Garza could have filled, Garza has met her burden here too. Garza has presented evidence that during February 1994 there were three openings for the position of security guard, a job that Hart–Wadley believed Garza may have been able to perform without accommodation. On summary judgment, Garza need only raise a question of fact regarding the existence of a vacant position that she could fill, not present conclusive proof, and she meets this standard.

It is also possible that the ADA would require a transfer to any vacant position that Garza could perform with accommodation. Leech testified that positions requiring less keyboarding than Garza's old job were available between November 1993 and April 1994. Abbott has argued that Garza may not have been able to perform her old job even with a voice activated computer, but it is undisputed that Abbott did not investigate whether Garza might be able to use voice activated software to perform some other job at Abbott not requiring the same use of the OPS, for which vacancies existed. Taking all of the evidence presented by Garza together, we find that she has raised sufficient questions about whether re-assigning her within Abbott was a reasonable accommodation to survive summary judgment.

## II. COUNT II—RETALIATION

In addition to charging that Abbott violated the ADA by discriminating against her, Garza also charges that Abbott retaliated against her for requesting accommodation of her disability, in violation of § 12203(a) of the ADA. The elements of a retaliation claim are: (1) statutorily protected expres-

sion; (2) adverse action by the employer; and (3) a causal link between the two. *Roth v. Lutheran Gen. Hosp.*, 57 F.3d 1446, 1459 (7th Cir.1995). Garza alleges that Abbott denied her access to the IPS, steering her toward jobs outside of Abbott, and then terminated her earlier than it would otherwise have done,[20] all in retaliation for her requests for accommodation.

Abbott argues that this claim merely restates that portion of the discrimination claim that is directed to Abbott's failure to re-assign Garza to a different position within Abbott, and that the retaliation claim must fail for the same reasons as that discrimination claim. The Court has rejected Abbott's arguments with respect to the discrimination claim related to the IPS. Moreover, we note that there is nothing improper about bringing more than one claim based on a common set of facts, although a plaintiff is limited to one complete recovery. *See Astor Chauffeured Limousine Co. v. Runnfeldt Inv. Corp.*, 910 F.2d 1540, 1547 (7th Cir.1990) (noting that FED.R.CIV.P. 8(e) permits multiple and even inconsistent claims, although "at the end of the day," the plaintiff is "limited to a single recovery no matter how many different ... theories it offers.").

We note for the record that Garza appears to have made out a prima facie retaliation claim. She has produced evidence that she engaged in statutorily protected expression by requesting accommodation for her disability, and that thereafter Abbott denied her access to re-assignment through the IPS, which we assume without deciding may constitute an adverse employment action. As for the causation element, the temporal sequence between the protected expression and the adverse action may indicate a causal link between the two. *Johnson v. University of Wis.—Eau Claire*, 70 F.3d 469, 481 (7th Cir. 1995); *Holland v. Jefferson Nat'l Life Ins.*

---

20. Garza appears to be making two claims regarding her termination: first, that the termination itself was retaliation; second, that Abbott retaliated by terminating her earlier than it would otherwise have done, apparently by choosing to count the partial days she worked against the one year period. Abbott does not challenge the second claim here. Abbott does, however, argue that it is entitled to summary judgment on the retaliation claim insofar as Garza claims that her termination itself was motivated by a desire to retaliate against her. Garza has not argued this point, nor presented any evidence that Abbott's stated reason for terminating her—that she had been absent from work for one year—was pretextual. The Court therefore grants summary judgment in favor of Abbott on Garza's retaliation claim to the extent that it is based on the bare fact of her termination. We express no opinion on Garza's argument that Abbott terminated her earlier than it would have in retaliation for her accommodation requests.

*Co.,* 883 F.2d 1307, 1315 (7th Cir.1989). Here, the adverse actions that Garza alleges followed on the heels of her requests for accommodation. We find that Garza has made out a prima facie case of retaliation sufficient to go to a jury, and therefore deny Abbott's motion for summary judgment on that claim.

## CONCLUSION

For the foregoing reasons, we grant Abbott's motion for summary judgment in part and deny it in part. The motion is granted with respect to the discrimination claim in Count I based upon Abbott's failure to procure a split keyboard for Garza, and with respect to the retaliation claim in Count II to the extent that it rests upon the bare fact of Abbott's termination of Garza. In all other respects, the motion is denied as to both counts.

Pursuant to a prior order issued by this Court, this case will proceed to trial, commencing at 10:00 a.m. on November 18, 1996, on the issues that remain in this lawsuit.